**MAHRT et, Plaintiffs, v. FIRST CHURCH OF CHRIST, SCIENTIST, Defendant.**

Common Pleas Court, Montgomery County.

No. 106317.   Decided May 19, 1955.

Guy H. Wells, Louis R. Mahrt, for plaintiffs.
Mason Douglass, Harold F. Demann, for defendant.

## OPINION

By MARTIN, J.

Plaintiffs, owners of residential property located in the same lots or allotments as defendant's church property, or in adjoining lots or allotments, all situated in a Dayton, Ohio, Residence "A" District, bring this action against defendant church, a non profit organization, to enjoin it and its members from parking automobiles on a lot recently purchased by defendant at the Southeast corner of Rubicon and Stonemill Roads, the same being immediately North and to the rear of another lot owned by defendant on which defendant's church structure stands.

The immediate cause of the filing of this action was permission granted on August 17, 1953, by the Dayton Zoning Board of Appeals to defendant and its members to use its rear lot for off-street parking purposes, subject to certain specified conditions.

Plaintiffs' claims are four fold:

First: That the action of the Board of Appeals was void and invalid, as Dayton Zoning Ordinances gave no power or jurisdiction to the Board to grant restricted parking rights in the area occupied by defendant's rear lot, under Section 225-32 (c) 15; Further, that such parking cannot be permitted as an accessory use under Section 211-10 (a to g) inclusive, nor can it be permitted on the theory that it involves an undue hardship under paragraph 9 of Section 225-32 (c).

Second: That the action of the Board in its August 17, 1953, meeting was irregular, arbitrary and contrary to law.

Third: That the deed restrictions on defendant's property prohibited the use of the lot in question for parking purposes.

Fourth: That the denial of off-street parking to defendant involves no hardship justifying equitable relief.

Defendant, on the contrary, claims that it and its members had the right to use its rear lot for off-street parking purposes, and that the Board had the jurisdiction to grant defendant the right to so use its lot, for three reasons:

First: The Zoning Ordinance specifically recognizes and grants such right as one inherently attributable to a church operation.

Second: That the terms of Section 211, paragraph 10, of the Ordinance recognizes the right of the Board to permit such parking as an accessory use.

Third: Section 225-32, paragraph 9, makes such parking use permissible, at the discretion of the Board, where there is undue hardship or reasonable doubt as to the application of any provisions of the Ordinance to the property.

To determine the relative merits of plaintiffs' and defendant's claims as to whether or not the Board of Appeals had the power, or properly exercised its power, to grant the permit allowing defendant to use its rear lot for parking purposes, the pertinent portions of relevant Zoning Ordinances must be interpreted and construed.

Section 211 of the **Building Zone Ordinance** reads as follows, in its pertinent parts:

Section 211 USES—RESIDENCE "A" DISTRICTS

In a Residence "A" District no building or premises shall be used and no building shall be erected to be used in whole or in part, for any industrial, manufacturing or commercial purpose or for other than one or more of the following specified purposes.

1. Single detached house used as a residence by not more than one family.

2. Churches and other places of worship and Sunday school buildings.

3. Public schools, parochial schools, colleges including dormitories, public libraries and public museums.

4. Clubs, lodges, fraternities, sororities, social, and grounds for games or sports; provided that all of the foregoing uses shall be limited to those which do not engage, either continuously or recurrently, in operation customarily or primarily carried on for gain.

5. Municipal recreation buildings, playgrounds, parks or reservations.

6. Hospitals, sanitariums or charitable institutions:

(a) Class I hospitals, sanitariums or charitable institutions shall be located not less than fifty (50) feet from each side lot line.

(b) Class II hospitals, sanitariums or charitable institutions shall be located not less than two hundred feet (200) feet from any lot line.

7. Cemeteries adjacent to or in extension of existing cemeteries.

8. Railroad or public service passenger stations, including accessory services, therein, and right-of-way not including switching, storage or freight yards or sidings.

9. The leasing of rooms by a resident proprietor, provided the total number of roomers and boarders does not exceed four (4).

10. Accessory uses or buildings customarily incident to any use permitted therein, provided that such accessory uses shall not include any activity commonly conducted for gain or any private way or walk giving access to such activity. Permitted accessory uses include the following:

(a) A private garage on the same lot with or in the building to which it is necessary and which is designed to contain not more than three motor vehicles * * *.

Provided, however, that a private garage may exceed a three-vehicle capacity if the lot whereon such garage is located contains not less than two thousand (2,000) square feet for each vehicle stored and provided that a garage for more than five vehicles shall be at least twenty (20) feet from each lot line except a rear lot line. * * *.

(b) The office or studio of a physician or surgeon, dentist, artist, musician, lawyer, architect, teacher or other member of a recognized profession in his place of abode, provided that not more than the equivalent of one-half of the area of one floor shall be used for such purpose.

(c) Customary home occupation, such as dressmaking, millinery, laundering, preserving and homecooking, provided that such occupations shall be conducted solely by resident occupants * * *.

(d) Farms, truck gardens, non-commercial greenhouses, provided that any greenhouse heating plant is distant at least 50 feet from any lot line.

(e) Non-illuminated real estate signs not over twelve square feet in area advertising the sale, rental or lease of only the building or premises on which they are maintained. * * *.

(f) Small non-illuminated announcement or professional signs not over two square feet in area except * * *.

(g) No non-conforming business or industrial use shall have exterior advertising signs aggregating more than * * *.

11. Restricted parking lots subject to approval by the Board of Appeals in accordance with the requirements of Section 225-32 (c) 15 of this Ordinance."

Paragraph 9 of Section 225-32 (c) titled "Board of Appeals," reads as follows:

"9. Where the strict application of any provision of this Ordinance would result in undue hardship upon the owner of specific property, or where there is reasonable doubt as to any provisions of this Ordinance or the map as applied to such property, the Board upon request by such owner, may modify such strict application or interpret the meaning of this Ordinance, so as to relieve such hardship; provided that such modification and interpretation shall remain in harmony with the general purpose and intent of this Ordinance, so that the public health, safety, convenience, comfort, prosperity or general welfare will be conserved and substantial justice done."

Paragraph 15 of said Section 225-32 (c) reads as follows in its pertinent parts:

"15. After due notice and public hearing, the Board may permit the use of lots in Residence Districts as restricted parking lots provided:

"(a) The area to be so used is located adjacent to a business or industrial district, or is separated therefrom by a distance of not more than fifty (50) feet.

"(b) The parking lot shall be for use in connection with a merchantile or industrial use located in the adjacent business or industrial district.

"* * *

"(f) The Board shall impose such other and further conditions as may be deemed necessary or desirable to reduce the adverse effect of a parking lot upon the preservation of the residential character and development of the residence district in which said parking lot is located."

Sub-paragraph (c), (d), and (e) of Paragraph 15 restrict parking to passenger vehicles, and prohibit repair work and the erection of advertising signs.

Section 225-32 (b) reads in its pertinent parts as follows:

"The hearings of the Board of Appeals shall be public. However, the board may go into executive session for discussion but not for vote on any case before it. * * *.

"The Board of Appeals shall act by resolution in which three members must concur. The Board shall adopt from time to time such rules and regulations as it may deem necessary * * *, all of which rules and regulations shall operate uniformly in all cases. All of its resolutions and orders shall be in accordance therewith."

The **Rules and Regulations of the Board of Appeals** provide under ARTICLE II, paragraph 2, the procedure of appeal involving public hearings, as follows:

"2. **Procedure of Appeal Involving Public Hearing.**

"In the case of any public hearing, the case shall be presented to the Board in accordance with the foregoing rules and regulations, and in addition it shall be the duty of the Board to determine:

"(1) If the appeal comes within the jurisdiction of the Board.

"(2) If the facts as presented would permit the Board to grant the appeal.

"(3) If the Board would grant the appeal, conditionally or otherwise, provided that there were no objections from persons in interest regarding the same."

ARTICLE II, paragraph 3, providing for rehearings, reads as follows in its pertinent parts:

"No rehearing of any decision by the Board of Appeals shall be had except:

"(1) On a written request for a rehearing. No request to grant a rehearing will be entertained unless new evidence is submitted which was not presented at a previous hearing. * * * In all cases the request for a rehearing shall be in writing, reciting the reasons for the request, and shall be duly verified as to fact and shall be accompanied by the necessary data and diagrams."

The following facts are stipulated and agreed upon by counsel for plaintiffs and defendant:

That defendant owns parts of Lots 16043 and 16051, City of Dayton, Ohio, bounded by Rubicon Road on the West, Stonemill Road on the North, and Sawmill Road on the South, which lots are located in a Residence "A" District.

That the North one-half of defendant's property, acquired by defendant from Frank P. Hartinger in 1952, is an unimproved lot located at the Southeast corner of Rubicon and Stonemill Roads, and such lot, by the terms of the deed from Frank P. Hartinger, is made subject to restrictions contained in a deed from Julia Patterson Crane to Julia S. Carnell, recorded in Volume 440, Page 543, of the Montgomery County Deed Records.

That said Julia Patterson Crane deed contains the following pertinent restrictive covenants:

"1. No house shall be built upon said premises less than two stories in height nor costing less than $5,000.

"2. No building or part thereof shall be placed less than forty feet back from the line of any street * * *.

"3. No double houses or block of houses or aparment houses shall be erected on said premises.

"4. No building shall be erected on said premises to be occupied as business property.

"5. No more than one dwelling house shall be built on a single lot according to the plat, and not more than one building other than the dwelling shall be erected on said lot—stables, and garages must be built on rear line of lot and * * *.

"6. No building to be moved on to any lot, all improvements to be erected on the premises.

"* * *

"10. No lot may be subdivided into smaller portions, the intent being to carry out a general plan and to preserve each lot on said plat as an individual building site.

"* * *

"15. All property not built upon within two years of time purchased may be repurchased by former owner at original price."

Restrictions 7, 8 and 9 relate to sanitary sewer drainage requirements, prohibition against front fences, and the manufacture and sale of intoxicating liquors. Restrictions 11, 12, 13 and 14 relate to houses facing and conforming with lot front, adherence to established grades, cement or equal quality walks, and approval of elevations by former owner.

That in a deed dated 1917, from Julia Crane and her husband to Frank B. Hale, Trustee, the following restrictions appeared:

"1. No buildings shall be erected on said premises to be occupied as business property.

"2. No house other than a church structure, shall be built upon said premises less than 2 stories in height nor costing less than $5,000. No church structure shall be erected on said premises costing less than $15,000, and in no event shall said premises be used for church purposes other than by what is known as the Christian Science Church.

"3. These premises may not be subdivided into tracts of less than

12

50 foot frontage, the intent being to carry out a general plan and in case of subdivision no tract shall have more than one dwelling house, and not more than one building other than the dwelling shall be erected on any of said tracts, stables and garages must be built on a rear line of such tract and on the corner tract as far back as possible, and shall not be built less than 12 feet high to the square and be built with gable or hip roof construction, but this shall not apply to children's play houses.

"4. No building or part thereof shall be placed less than 40 feet back from the line of any street abutting on the front or side of said premises by the shortest line; * * *.

"5. No double houses or block houses, or apartment houses shall be erected on said premises or any part thereof.

"6. No building shall be moved on these premises or any part thereof, being the intent that all improvements are to be erected on the premises."

7, 8, 9, 10 and 11 prohibit front fences, regulate side fences, prohibit manufacture and sale of intoxicating liquors, require all houses to face conforming with lot fronts, adherence to natural grades of lots, and that walks be of cement or material of equal quality.

That the 1924 deed from Frank B. Hale, Trustee, to the First Church of Christ, Scientist, referred to the source of his title as being the deed from Julia Crane to Frank B. Hale, Trustee, in 1917. The same is true of the 1927 deed from Hale, Trustee, to the First Church of Christ, Scientist.

That in 1942, in an indenture from Johanne A. Crane to Frank B. Hale, Trustee, the restriction in the 1917 deed from Crane to Hale. Trustee, confining the use of the premises to Christian Science Church purposes, was discharged and released insofar as it purported to limit the use of the church property to Christian Science Church purposes only.

That the deed from the executors of the estate of Mrs. Mary P. Davisson, deceased, to Hartinger, dated 1951, recites that the conveyance of a on-half interest in the parcel facing North on Stonemill and West on Rubicon is made subject to the restrictions contained in the Crane to Carnell deed of 1920. The same is true of the deed from Jefferson Patterson conveying his one-half interest to Hartinger in 1951, and of Hartinger's deed to the First Church of Christ, Scientist, dated 1952.

The evidence in this case shows clearly and convincingly that defendant's real estate located on parts of Lots 16051 and 16043, on the Revised Plat of the City of Dayton, Ohio, consists of two parcels out of a total of twenty parcels, lying between Rubicon Road on the West and Brown Street on the East, and between Stonemill Road on the North and Sawmill Road on the South; that the eighteen parcels lying East of defendant's two parcels are in Lot 16051, four of which front to the East on Brown Street, seven to the South on Sawmill Road, and seven to the North on Stonemill Road; that of the eighteen parcels in lot 16051, five facing on Stonemill and one facing on Sawmill have never had any restrictions whatsoever; that the restrictions on the four parcels facing Brown Street in said lot were relaxed or abandoned when a church, an apartment house, a dentist's office, and a funeral home

were constructed or established over a period of years; that the vacant parcel, or lot in issue, was acquired by defendant church from Hartinger in 1952, by Hartinger from Jefferson Patterson and the executors of the estate of Mary P. Davisson in 1951, by the latter two from Julia S. Carnell, and by Julia S. Carnell from Julia Crane in 1920, subject to restrictions hereinbefore set forth, and specifically referred to in the deeds by which both Hartinger and the defendant church acquired title.

That the Residence "A" District in which defendant's and plaintiffs' properties are located is bounded by The Pennsylvania Railroad, an Industrial "A" District (The N. C. R. Co.) and a Business "B" District on the North, by a Business "B" District on the east (Brown Street), by an Industrial "A" District a short distance West of Main Street on the West, and by the Dayton corporation line on the South. That this Residence "A" District has many fine, well-kept residences and premises, and is a beautiful residential area with curving streets, beautiful trees. and well-kept shrubbery. That aside from the non-residential development of the parcels facing on Brown Street, including the four parcels in Lot 16051 (located in a Business "B" District), the entire Residence "A" District has been developed along the lines set forth in the restrictions hereinbefore detailed in the deeds from Julia Crane to Julia S. Carnell and to Frank B. Hale, Trustee, although the owners of the six unrestricted parcels were not required to do so. That the parcel in issue is 450 feet West of the West line of Brown Street, is 166.2 feet long on the East side, 158 feet long on the West side, 163 feet wide on the South side, and 126.25 feet wide on the North side.

That the parking lot plan (Plaintiffs Exhibit 7), approved by the Plan Board, contemplates the parking of fifty-one automobiles, subject to the six conditions laid down by the Plan Board with relation to black-topping, landscaping, setback, bumper blocks, one entrance and exit, restricted use, and a gate to be closed when not in use. That of defendant's church membership of approximately 800, some 300 to 500 attend church services on Sundays mornings and park their automobiles within a radius of from one and one-half to two blocks from the church, along the curbs of Stonemill, Sawmill, Rubicon, Springhouse, and Plum-wood Roads, and South Main Street. That comparatively few cars had to be parked more than a block and a half from the church. That the parking of cars between one and two blocks from the church was an inconvenience to defendant's members, but not a hardship.

That the inability of defendant and its members to use the parcel purchased to the rear of the church for parking purposes, or for any purposes other than decorative landscaping or specifically permitted principal and accessory purposes, more nearly constitutes an undue hardship than the inconvenience of walking one to two blocks to the church from parking places. That the noise, gas fumes, commotion, asphalt odors, dangers to pedestrians, and the glare from lights at night from fifty-one or less automobiles parked on a landscaped and asphalt surfaced lot for an hour or two on Sunday mornings and Wednesday evenings would not, in fact, constitute a nuisance to the neighborhood or to plaintiffs, but would actually inconvenience them less, if anything, than having the same cars parked at their curbs.

The uncontradicted evidence shows that Frank Hartinger, before he acquired title to the parcel of land in issue and conveyed the same to defendant, made application for a parking area permit for such lot back of defendant's church, which was refused by the Division of Building Inspection of the City of Dayton, from which refusal Hartinger appealed to the Board of Appeals on February 2, 1950. On February 20th the Plan Board of Appeals, after notice to interested parties and a hearing, rejected the appeal, stating that the evidence submitted did not show that a real need existed which could not be met by other methods.

On February 6, 1953, after defendant acquired title to the parcel in issue from Hartinger, a second appeal was filed by defendant from a refusal to grant a permit, and, after notices to property holders, was heard on March 4, 1953, at which time the appeal was tabled until April 6, 1953, when the appeal was again heard and denied on the ground that "an offstreet parking lot at the above mentioned lot was not necessary and could not be permitted in harmony with the general purpose and intent of the Building Zone Ordinance." There was no finding, however, that it was contrary to the public health, safety, con-.venience and morals.

On June 15, 1953, the matter again came before the Plan Board on a rehearing, after notice was duly given to property owners or holders, at which time the defendant was for the first time represented by Mason Douglass, counsel representing defendant in this suit. The property owners opposing the granting of the permit were represented by two of their own number, Louis Mahrt and Guy Wells. After lengthy discussion the appeal was ordered tabled for further study. Several days after the hearing some telephone conversations ensued between counsel for defendant and counsel for the property owners, to the effect that counsel for both sides would be vacationing either during July or August, and that, therefore, nothing should be done in the pending case until Fall. However, without any request from counsel on either side, the case was placed on the calendar of the Plan Board on August 17, 1953. Messrs. Douglass and Hartinger, without any formal notification from the Plan Board, but through inquiry, discovered that the matter was to come before the Plan Board on August 17th, and appeared on said date at the time the case was called, and Mason Douglass, as counsel, was given an opportunity by the Board to make a statement on behalf of the defendant, which statement was a reiteration of statements theretofore presented by him and the defendant. The plaintiffs were not present, nor were their counsel, Wells and Mahrt, both being either on vacation or unaware that the matter was on the calendar of the Board for disposition. The minutes of the Plan Board disclose that Mason Douglass made a statement for the defendant to the effect that the different times for church services and Sunday School made it impossible for defendant's members to find parking places. (Impossibility not shown by the evidence in this case.) The minutes further show that the Board, after considering all phases of the case, decided that the request to use the lot for off-street parking purposes was a reasonable one and could be granted in harmony with the general purpose and intent of the Dayton Zoning Ordinance, subject to the six conditions hereinbefore detailed and appearing on "Plaintiffs' Exhibit 5."

That prior to August 17, 1953, the Board had granted four other churches in other areas, one in Residence "A," and three in Residence "B," restricted parking permits on the theory (not recited in the minutes of the Board of Appeals) that off-street parking was a desirable municipal policy, that such policy was under study and would shortly be enacted into an ordinance. However, the proposed ordinance was never presented, due to its doubtful constitutionality or some other reason.

That the Board of Appeals approved off-street parking on lots or parcels adjacent to a total of twenty-four churches in Dayton, of which three were in Residence "A," Districts, one in Residence "A" and Residence "B," sixteen in Residence "B," one in Residence "B," and Business "B," one in Business "A," and two in Business "B." That in practically all of these cases there were no objections by adjacent property owners, and in several it is apparent from photographs introduced as exhibits herein that stores, filling stations, and apartments were adjacent or close to the parking areas. That in the instant case 69 property owners in the Residence "A" District surrounding the defendant church, all plaintiffs herein, oppose the granting of a permit to defendant for offstreet parking on the parcel in issue.

In considering plaintiffs' first claim, that the provisions of the zoning ordinance do not permit a restricted parking lot at the rear of defendant's church, it is necessary to construe and interpret the pertinent provisions of the ordinance.

The general purpose of the Building Zone Ordinance is stated in the preliminary purpose provision as the "regulating, restricting, and limiting, in the interests of the public health, safety, convenience, comfort, prosperity, and general welfare, the uses and the location of buildings and other structures and of premises to be used for trade, industry, residence, or other specified uses."

After dividing the City of Dayton into eight districts, shown on the 17th amended building zone map, dated July 6, 1949 (Plaintiffs' Exhibit 4), the ordinance defines words and phrases used therein, sets forth general provisions applicable to all residential areas and existing buildings and uses, and then in Section 211, title: USES—RESIDENCE "A" DISTRICTS, prohibits the use of premises or the use or erection of any building for industrial, manufacturing or commercial purposes, and thereupon specifically permits, in nine sub-paragraphs, the erection of single, detached, one-family residences, churches, Sunday school buildings, public and parochial schools, colleges, with dormitories, public libraries and museums, clubs, fraternal organizations, social, recreational and community center buildings, parish houses, and sports fields not carried on primarily for gain, hospitals, sanitariums, charitable institutions, cemetery extension, railroad and public service passenger stations, and houses having not more than four roomers and boarders.

Then paragraph 10 states:

"10. Accessory uses or buildings customarily incident to any use permitted herein, provided that such accessory uses shall not include any activity commonly conducted for gain or any private way or walk giving access to such activity."

Then the following specifically permitted accessory uses are listed: (a) private garages, (b) professional offices, (c) customary home occupations, (d) farm truck gardens, greenhouses, (e) real estate signs, (f) professional signs, and (g) non-conforming use signs.

Then paragraph 11 of Section 211 specifically permits restricted parking lots in accordance with the requirements of Section 225-32 (c)-15.

Paragraph 15 of Section 225-32 (c), the pertinent provisions of which are hereinbefore set forth in full, provides for restricted parking lots in Residence "A" Districts only if they are not more than 50 feet from an adjacent business or industrial district, and for the purpose of serving such district.

The specific allowance of restricted parking lots (usually for gain) by the two above sections to serve business and industrial districts not over 50 feet removed, impliedly excludes such commercial lots from all other portions of Residence "A" Districts. However, accommodation parking not for gain constituting customarily incidential accessory uses to permitted uses are not excluded.

Since the law requires a construction of the provisions of a zoning ordinance prohibiting or restricting the type, location, or use of property in Residence "A" Districts most favorably to the owners of the property affected by the restriction, consistent with the protection of the public health, safety, convenience, comfort, prosperity, and general welfare, we must first ascertain whether or not an off-street parking lot in a Residence "A" District, of the type contemplated, is entirely prohibited by the terms of the Dayton Zoning Ordinance.

It is obvious at the outset that the proposed parking area for church members only, being 450 feet from Brown Street, a Business "B" District, could not qualify as a restricted parking area within the provisions of Sections 211-11 and 225-32 (c)-15 of the Dayton Zoning Ordinance, as such Sections contemplate an area within 50 feet of a business or industrial district, for a mercantile or industrial use in connection with the adjacent district, which obviously contemplates a restricted parking lot conducted for gain.

Consequently, the authority, if any, of the Plan Board to grant the permit was based upon either the theory that the use was accessory, that is, one customarily incident to uses permitted under Section 211, though not one specifically listed under paragraph 10 thereof, or upon the theories set forth in paragraph 9 of Section 225-32 (c), hereinbefore set forth, that undue hardship would result to defendant by the strict application of the provisions of the ordinance, or that there is reasonable doubt as to the provisions of this ordinance.

Is the proposed use one customarily incidental to the use of a church by its members?

With relation to the argument of plaintiffs that parking lots, being an "activity commonly conducted for gain," cannot qualify as accessory uses, we are of the opinion that church parking lots, like those of many organizations maintaining parking lots to accommodate their members, employees, etc., are not to be classified as an activity commonly conducted for gain, but rather as an activity commonly conducted not for gain.

As to whether or not parking lots are customarily incidental to churches, the evidence shows that in 1954 twenty-four churches in Dayton (11 new or recent, 13 older), or about 9% of the approximately 250 Dayton Churches, had parking areas adjacent to the church. There is no evidence of percentages in other cities close to Dayton. Consequently, it appears that no custom had developed before World War II through past usage by the older churches and their members establishing parking areas as incidental accessory uses to such older churches constructed during the fifty years more or less before World War II. However, it is probably correct to state, and for the Court to take judicial notice of the fact, that practically all churches built since World War II, now being built, or to be built, in urban and rural communities, for some years to come, have and will have parking areas adjacent to the church building or buildings. Thus, as to recent, present, and future new church construction, a parking area is and will be a customary incidental accessory use in the City of Dayton, and other urban as well as rural areas in most of the United States, and this will probably continue to be true even though our present individually owned and operated means of transportation be modified or changed in form.

Although it is clear that the evidence fails to establish that Ninety percent (90%) of the city churches of the pre-World War II period in the Dayton and Greater Dayton area either owned property adjacent to church buildings adaptable to membership parking or during said period customarily used adjacent property, if any, for membership parking, nevertheless, it probably was and now is generally customary for the priests, rabbis, ministers (or their equivalent), secretaries, custodial help, and other employees of such churches, to park their automobiles on the properties of the churches they serve, space permitting, whether or not the churches are located in a residence "A" District.

The church membership, that years ago used public transportation to go to church, or were content with the relatively larger number of curb parking spaces in proportion to the total number of automobiles, now go to church in much larger numbers of automobiles, for which there are relatively much fewer curb parking spaces. This condition has made it advisable and necessary for the newer, more recently constructed churches, to provide off-street parking lots for the automobiles of their members and their employed staff.

Thus, parking lots are not only customarily incidental accessory uses to recently and newly built churches and church buildings, but such lots are reasonably necessary accessory uses under present conditions, and will probably be even more necessary in the immediate future. In this situation the older churches of pre-World War II construction now feel, and will increasingly feel in the future, the need of off-street parking areas and facilities adjacent or near to such churches as much as the churches more recently built, and to be built in the future.

How can a line be equitably drawn between the older churches having adjacent land available for parking and the newer churches without discriminating against the older churches and placing them at a disadvantage by not permitting them to adapt their accommodations to

the present parking needs and conveniences of their membership under existing conditions? Should the fact that such need did not exist in 1925, when defendant's church was built, forever preclude it from attempting to adjust to changing conditions? These conditions include a large population increase, a huge increase in the number of automobiles and the number of people riding in them, and the consequent increase in automobile traffic, necessitating in turn more traffic regulations and restrictions (including parking), thereby making it more difficult as the years pass to find curb parking space within a reasonable distance from the church, particularly on days when church attendance is large.

In view of these considerations, may it not be said that an incidental accessory use, though not customary when defendant's church was built, nor for many years thereafter, may now be customary in this and other urban and rural communities in light of the more recent usage established by the newer churches and the older churches owning adjacent land adaptable to parking.

The Board's decision granting the permit is consistent with our interpretation of paragraph 10, Section 211 of the ordinance, that a parking lot for defendant's members and staff is now a use customarily incidental and accessory to defendant church and other churches, both new and old, having adjacent land available for off-street membership parking.

Since the finding and decision of the Board made no mention of undue hardship to defendant and its members, we cannot assume that the permit was granted as a variance from the provisions of the Dayton Zoning Ordinance.

It is true that the Board was called upon to interpret the requirements of Section 211 of the Building Zone Ordinance in defendant's appeal from the denial of the permit by the Department of Service and Buildings, and even though the Board may have entertained a reasonable doubt as to the provisions of paragraph 10 of said Section, it does not follow that the Board found that in granting the permit it was doing so pursuant to an interpretation constituting a variance from the strict meaning of the language of said paragraph and section. Rather, we may assume that the Board, in granting the permit, probably did so because it interpreted paragraph 10, Section 211. as authorizing, under existing conditions, the granting of a permit for off-street restricted parking as a customarily incidental accessory use.

It was not necessary for the Board. in granting the permit, to indulge in a variance from the literal meaning of the language of said paragraph and section so as to relieve hardship. It was only necessary for the Board to interpret such language to determine its true meaning and intent in order to warrant such action.

The difficulty experienced by defendant's members in 1954 in finding parking spaces and walking one to two blocks to defendant's church was not an undue hardship, but an inconvenience which at times probably bordered on hardship. But such inconvenience, sufficiently aggravated, might result in undue hardship in the not too distant future.

However, if it be assumed that the Board granted the permit on

the theory of a variance from a strict interpretation of paragraph 10, Section 211 of the Ordinance, to relieve an undue hardship, such action can be supported on the theory that it was an undue hardship on defendant as an older church to own a parcel of land which, due to zoning and deed restrictions (hereinafter discussed), it could not use for any church purpose except possibly for landscaping and beautification, whereas a new church would ordinarily not be so handicapped. It is against the policy of the law to unduly restrict the use of land so that the owner is deprived of the usual rights, privileges, and incidents of ownership and possession.

From the foregoing, it follows that the finding of the Board "that the request was a reasonable one and . . . . . could be granted in harmony with the general purpose and intention of the Ordinance . . . . ." is supported by the facts, the provisions of paragraph 10, Section 211, of the Zoning Ordinance interpreted in light of existing conditions, and the Ordinance as a whole, which does not prohibit parking lots as accessory church uses.

Consequently, we find that the provisions of the Zoning Ordinance permitted the restricted parking lot as a customarily incidental accessory use to defendant church, and that the Board had the power and jurisdiction to grant the permit to defendant church for such restricted off-street parking lot for the use of its members only, subject to specified conditions.

With relation to plaintiff's second contention that the action of the Zoning Board of Appeals, at its August 17, 1953, meeting, was irregular or arbitrary and contrary to law, a review of the pertinent facts is helpful.

The evidence shows that the re-hearing on June 15, 1953, before the Plan Board, was quite exhaustive and complete, involving extended arguments by Louis Mahrt and Guy Wells, appearing for the property owners, and by Mason Douglass, appearing for the defendant. Many property owners and a number of defendant's members were present. After the arguments and a lengthy discussion, the Plan Board ordered the appeal tabled for further study.

The minutes of the June 15th meeting state:

". . . . . Mr. Mason Douglass, attorney, and Messrs. Hartinger & Oldham and several other members of the Church were present to present this appeal to the Board. Mr. Douglass, speaking for his client, quoted several sections of the Building Zone Ordinance which he interpreted to permit the use of vacant ground adjacent to Churches, Schools, Institutions, Libraries, etc. for off-street parking, it being his feeling that under the circumstances this case should not be before the Board for consideration. Also present at the meeting were a large number of persons who reside in the area in question, including Messrs. Louis Mahrt and Guy Wells, attorneys. Both attorneys spoke and enumerated the reasons why this case should be denied, principally the fact that the area in question is strictly single family residential, and it was their hope that the area would continue as such and were very much opposed to the creation of an off-street parking adjacent to the Church, stating that there were adequate parking lots in the area . . . . ."

On June 20, 1953, Louis Mahrt, counsel for the property owners, wrote a three-page letter to the Board of Appeals, calling their attention to a pending case and reciting the names of property owners objecting to the granting of a permit to defendant for an off-street parking lot. On June 24, 1953, Mason Douglass addressed a five-page letter to the Plan Board in response to the letter addressed to them by Mr. Mahrt on June 20th, in which letter other considerations than those presented by Mr. Mahrt in his letter were discussed. Several days later counsel for plaintiffs and defendant agreed in telephone conversations that the matter pending before the Plan Board should be passed until Fall, as counsel would be vacationing during July or August. On July 3, 1953, Mason Douglass, through his secretary, notified the Plan Board that he would be out of town until the last week of July, and requested them to withhold their decision until that time. No further notice or request was made of the Plan Board by counsel for plaintiffs or defendant with relation to the continuance of the matter pending before them, prior to August 17, 1953. Several days before August 17, 1953, Messrs. Douglass and Hartinger, without any notification from the Plan Board, discovered that the appeal had been placed on the Plan Board's calendar for disposition on August 17th. The Plan Board's calendar of Monday, August 17, 1953, refers to the meeting on that date as the sixteenth regular meeting for the year 1953, and lists the case of the First Church of Christ Scientist as Case No. 2850, the same being third in order on the calendar. Plaintiffs and counsel for plaintiffs were not present, it appearing that plaintiffs' counsel were either on vacation or unaware that the matter was on the calendar for disposition. Messrs. Douglass and Hartinger were both present at the time that the matter was called, and Mason Douglass made a statement to the Board, stating, among other things, that it was impossible for defendant's members to find parking places along the streets surrounding the church, due to the different times of the church services for adults, children, and Sunday school groups.

The Board decided that the request to use the lot for off-street parking purposes was a reasonable one and could be granted in harmony with the general purpose and intent of the Dayton Zoning Ordinance, subject to six conditions detailed by them in "Plaintiffs' Exhibit 5."

The minutes of the August 17, 1953, meeting refer to the session as a "meeting," and refer to Mason Douglass and Frank P. Hartinger being present for the purpose of discussing the appeal with the Board. The only reference in the minutes to remarks made by Mason Douglass indicates that he summed up the parking difficulties by stating that it was "impossible" for members of the church to find parking places, due to the different times for services in the church. The use of the word "impossible" could not have mislead the Board, as they knew parking was possible but difficult at times. The minutes disclose that the members of the Board considered the various phases of the case theretofore presented to them. The statements made by Mason Douglass were a reiteration of statements already made to the Plan Board at the hearing on June 15th.

We are of the opinion, from all the evidence, that the meeting of August 17th can scarcely be called a hearing or a rehearing of the appeal on the merits; rather, it was a meeting at which the Plan Board discussed and rendered its opinion on the appeal. The case was put on the calendar for disposition, and presumably would have been disposed of by the Plan Board without any further arguments or statements by counsel for either the property owners or the church.

There is nothing to show that the decision of the Plan Board would have been different from or other than the decision rendered had Mason Douglass not been present at the August 17th session. It is true that the finding of the Board that the request could be granted in harmony with the general purpose and intention of the Ordinance was in conflict with their earlier finding of April 6, 1953, that the request could not be permitted in harmony with the general purpose and intention of the Building Zone Ordinance. However, the conflict in the two findings does not establish that the finding of August 17, 1953, was a gross abuse of discretion and arbitrary.

Although it would have been more desirable for both plaintiffs and defendant's counsel to have been present when the Board announced its decision, we are unable to find that the announcing of the decision by the Board, after the statement by defendant's counsel, without plaintiffs' counsel being present to answer such statement, was such an irregularity as to amount to arbitrary, unconstitutional and unlawful conduct as would vitiate the Board's decision.

The Court has not discussed the question of whether or not defendant strictly complied with the provisions of Article 2, paragraph 3, of the Rules and Regulations of the Board of Appeals, relating to written requests for re-hearings, the reasons therefor, and the necessity of new evidence to support the same, for the reason that plaintiffs appearance, together with their counsel, on June 15, 1953, before the Board, their active and exhaustive participation in the re-hearing on the merits, in which both sides exhaustively presented their facts and their arguments, and the written information thereafter supplied by plaintiffs to the Board, all constitute a waiver on plaintiffs part of any objection that might otherwise have been interposed on the grounds that defendant did not comply with the Rules and Regulations governing rerehearings.

Plaintiffs third contention is that the deed restrictions on defendant's property prohibit the use of the lot in question for parking purposes. If this contention is well taken, defendant cannot use its lot for restricted parking, though so permitted by the Zoning Ordinance, as the deed restrictions, if valid, are controlling over the provisions of the Zoning Ordinance.

Assuming that plaintiffs have shown a uniform plan of development of the eighteen parcels in lot No. 16051, and that the deed restrictions are enforceable by those plaintiffs who own restricted parcels in said lot, which assumptions are not established by the evidence, it is clear that none of the restrictions binding defendant, and appearing in the two Julia Crane deeds, conveying the church tract and the lot in

issue, either expressly or by necessary implication, prohibit the use of such lot as a restricted parking area for defendant church and its members.

It is obvious from reading the relevant restrictions in the deeds from Julia Crane to Julia Carnell and to Frank P. Hale, Trustee, hereinbefore set forth, that it was the intention of Julia Crane to preserve each building lot as an individual building site for one two-story house, costing at least $5,000.00, built on location, set back at least forty feet together with one accessory building, either a stable or garage, at the rear lot line, all pursuant to a general plan. Double houses, a block of houses, apartment houses, and business houses, are prohibited.

The right of a grantor, after two years, to elect to repurchase the property sold, if a two-story single residence building costing not less than $5,000 is not then erected (restrictions 1 and 15 in Julia Crane to Julia Carnell deed), is a personal right which may or may not be exercised by the grantor within a reasonable time after the lapse of two years, and is a right which no other grantor or grantee of other lots in the allotment can require him to exercise. Obviously, this personal right may be exercised by the grantor, not because the land is used for off-street parking purposes, but solely because the grantee has not built thereon a two-story single residence costing not less than $5,000 within a reasonable time after the lapse of two years. Nor does the use of the lot for restricted parking purposes, providing the same has a set-back of not less than forty feet from the street lines of Rubicon and Stonemill Roads (restriction 2, Julia Crane to Julia Carnell deed), offend the provisions of restriction 10 in the Julia Crane deed applicable to the lot in issue, requiring that:

"No lot shall be subdivided into smaller portions, the intent being to carry out a general plan and to preserve each lot on said plat as an individual building site."

In effect, the restrictions on the vacant lot in issue require the owner, if he elects to build, to erect a two-story single house thereon, costing $5,000 or more, plus a stable or garage if desired, and prohibit other types of structures or buildings.

The restrictions do not purport to dictate to the grantee what use he might make of the land, or the surface of the ground, so long as the use is lawful and is not related to the construction of a building. Subject to the right of the grantor to re-purchase the lot from the grantee if not built on in two years, the grantee has the right to use the land and the lot for any lawful purposes not prohibited. After the lapse of a reasonable time after two years of ownership by the grantee, the grantor loses whatever right he may have had to re-purchase the lot, and thereafter no one can directly or indirectly require the grantee to build a two-story single dwelling thereon.

Since the law favors the free use of property by the owner, it will not impose any restraints or limitations on defendant's use of its property for purposes not covered, expressly or by necessary implication, by the restrictions in the Julia Crane deeds, merely because defendant has not carried into effect one of the principal purposes of the restrictions,

to-wit: To encourage the building of one two-story single dwelling on each building site on lot 16051.

In determining that the restrictions do not prohibit a parking lot, the Court considered, among other things, that there are no provisions in the restrictions to the effect that the lots restricted were to be used "for single two-story residence buildings only and for no other purposes whatsoever."

It is clear that defendant's use of its lot for restricted off-street parking, with a set-back of forty feet, is not inconsistent or in conflict with the restrictions in the Crane-Carnell deed purporting to preserve all lots as individual building sites. It follows that the use of the lot for restricted parking by defendant's members is not a violation of the restrictions.

Although there was a general plan for the development of the building lots or parcels in lot 16051, the evidence suggests that the plan lacked uniformity, in that the restrictions on the four lots facing Brown Street were relaxed or abandoned without legal action being taken to prevent the same, and further that six of the remaining fourteen lots facing on Stonemill and Sawmill Roads were wholly unrestricted. How can restrictions be said to be even substantially uniform in application when only eight out of eighteen building lots in lot No. 16051 were subject to the restrictions, not including the two building lots in lot No. 16043, which was unrestricted?

Further, how can it be said that the restrictions were inserted in the deeds for the mutual benefit of and enforcement by the common grantor and all of the original grantees, and their successors, when ten of the grantees, and/or their successors in title, were and are not bound by any restrictions, either because there were none in the original deeds or the grantees of the property on Brown Street have violated such restrictions, and their violations have been acquiesced in by all grantors and grantees?

Ohio cases deny grantees the right to enforce restrictions against other grantees under the state of facts established by the evidence in this case.

Kiley v. Hall, 96 Oh St 374; Snow v. Socony Vacuum Oil Co., 46 Abs 317; Hayslett v. Shell Petroleum Corp., 38 Oh Ap 164; Grant v. Hickok Oil Co., 40 O. O. 9; 84 Oh Ap 509; Blum v. Hodapp, 55 Abs 203; Sopartkovich v. Rieger, 66 Oh Ap 332; 20 O. O. 167; Edwards v. Ohio State Students Trailer Park Coop. Inc., 84 Oh Ap 518; 40 O. O. 13; Smith v. Volk, 85 Oh Ap 347; 40 O. O. 213; Baptist Ass'n v. Scovil, 107 Oh St 67.

With relation to plaintiffs fourth claim that the denial of off-street parking to defendant involves no hardship justifying equitable relief, we have already decided that it was unnecessary for defendant to prove any hardship on the part of its members or itself since it was entitled to use its lot for restricted off-street parking as a customary incidental accessory use. However, we also decided that it was a hardship to defendant to own the lot and not be able to use it for any purpose except landscaping and beautification.

It seems to us that the burden is not on the defendant to prove hardship to itself, but rather the burden should be on plaintiffs to estab-

lish hardship, damage, or substantial inconvenience to themselves and their property, as a result of permitting off-street parking on defendant's lot.

After careful consideration of all the evidence, we are of the opinion that the concentration of fifty-one automobiles on defendant's proposed parking lot for a couple hours on Sunday mornings and Wednesday evenings would not even inconvenience plaintiffs, except those whose properties abut or lie closest to said lot, and such plaintiffs only slightly.

Certainly such parking would not depreciate the values of plaintiffs properties, as claimed by them, nor would such concentration of cars, and their moving in and out of such parking lot, taking into consideration the gas fumes, the noise, the possible danger to pedestrians, the headlights at night, and the other factors involved, including the physical lay-out of the lot itself, constitute a nuisance to plaintiffs and the neighborhood surrounding such parking lot. In fact, it would seem that such off-street parking area would be more convenient and more desirable for the great majority of plaintiffs, who, as a result, would have fewer motor cars parked at the curbs in front of their properties.

Indeed, it is difficult to understand why sixty-nine plaintiff property owners or holders living in the Residence "A" area immediately surrounding defendant church and proposed parking lot prefer to have more automobiles parked at their curbs when defendant church is holding services, than to have fewer automobiles as a result of the off-street parking of as many as fifty-one cars on defendant's lot.

From the foregoing it follows that the Court is required to find for the defendant and against the plaintiffs on the issues made up by the pleadings, as amended, and the evidence.

The plaintiffs prayer for a temporary and permanent injunction against defendant and its members using its lot for parking purposes is denied. Plaintiffs petition will be dismissed.

An entry may be drawn accordingly.