5011 COMMUNITY ORGANIZATION ET AL. *v.*
THOMAS E. HARRIS ET AL.
(6012)

BIELUCH, STOUGHTON and NORCOTT, Js.

Argued April 21—decision released October 4, 1988

*George A. Athanson,* with whom, on the brief, was
*Stephen R. Corbeil,* for the appellants (plaintiffs).

*John F. McKenna,* with whom, on the brief, was
*Thomas J. Farrell,* for the appellees (defendants).

STOUGHTON, J. This is an appeal by the plaintiffs[1]
from the trial court's denial of a declaratory judgment
upholding certain deed restrictions and the denial of
a permanent injunction to restrain the defendants from
building on the land in question anything other than

---

[1] 5011 Community Organization is a nonprofit corporation representing
individual property owners on Ashford and North Main Streets in Hartford.

a residential structure. The plaintiffs argue that the trial court erred (1) in not enforcing certain restrictions contained in a deed dated November 18, 1914, (2) in concluding that the proposed commercial use of the land would not be violative of said restrictions, and (3) in denying the plaintiffs equitable relief in the form of a declaratory judgment and an injunction. Our conclusion with respect to the second issue is dispositive of this appeal and, accordingly, we do not address the remaining two claims.

The trial court made the following findings of fact. Early in 1986, the defendants, Burger King Corporation and Te-Al Foods Corporation, applied for a permit to build a restaurant in Hartford on three parcels of land owned by Thomas Harris and John Testa. One of these parcels, hereinafter lot three, has an abandoned gasoline station situated upon it. The remaining two parcels, which will be referred to as lots one and two, had no structures upon them except for a billboard on lot one. The three parcels are located in a B-3 zone which would ordinarily permit the construction of the proposed Burger King restaurant. Lots one and two were owned by Testa and were part of a forty-four lot subdivision as shown on a 1914 map of the property of Joseph P. Halliday. Lot three is not a part of the original subdivision and it is beyond dispute that a restaurant may be constructed on it.

In the fall of 1914, Halliday conveyed lot one to Nellie F. Wall with certain restrictions as to the type and number of dwellings that may be constructed on the lot. This or similar deed restrictions appear on the land records with respect to thirty-seven of the forty-four lots of this subdivision, including lot two. On December 28, 1962, lot one had the restriction rerecorded on the conveyance to Testa.

In October of 1986, Testa and Harris sold all three parcels of land to agents of Te-Al Foods Corporation.

The deed by which Testa conveyed lots one and two contained the provision that "[b]oth of said premises are conveyed subject to any and all provisions of any ordinance, municipal regulation, a public or private law and to building, building line and zoning restrictions of the town of Hartford, with particular reference to restrictions set out in a deed from Ernest C. Halliday to Nellie F. Wall, Trustee, dated August 15, 1914 and recorded at Volume 404, page 569 of the Hartford Land Records." This paragraph refers to the Halliday to Wall deed recording the restrictions as to lot one. No reference was made in this deed to the original deed containing similar restrictions as to lot two.

The amended building application indicates that the proposed Burger King restaurant is to be situated on lot three. A parking area, menu board, microphone for drive-through orders, lights and brick trash enclosure are to be located on either lot one or lot two.

The issue before the trial court was whether the deed restrictions on lots one and two were still enforceable, and, if so, to what extent they were enforceable. The trial court reached the following conclusions: (1) that there existed a common scheme of development in the original forty-four lot subdivision; (2) that, owing to the Connecticut Marketable Record Title Act, the restrictions as to lot one were still in effect while the restrictions as to lot two had not been sufficiently demonstrated by the plaintiffs; and (3) even though the plaintiffs had demonstrated that the restrictions as to lot one remained in force, the deed restrictions did not prohibit the defendants' proposed use of the property. For these reasons, the court declined to grant the plaintiffs' request for injunctive relief. Additionally, it refused to render a declaratory judgment that the deed restrictions were valid and enforceable on the ground that the plaintiffs had not complied with Practice Book § 390 (d) which requires that all persons hav-

ing an interest in the subject matter of the complaint be given reasonable notice thereof. The court noted that only about one half of the members of the original subdivision had received notice of this action. On that ground, the court refused to render a declaratory judgment. We agree with the trial court that the deed restrictions do not prohibit the defendants' proposed use of the property and we therefore need not reach the remaining assignments of error.

The trial court concluded, and we agree, that the restrictions on the subdivision were created to benefit the lot owners. Thirty-seven of the forty-four lots comprising the subdivision contained similar restrictions. Moreover, there was no evidence that Halliday intended to retain ownership of any part of the tract. It is clear that there was a common scheme of development in the original subdivision. *Marion Road Assn.* v. *Harlow,* 1 Conn. App. 329, 333, 472 A.2d 785 (1984).

Halliday conveyed lot one to Nellie F. Wall with a deed containing the following restrictions: "It is hereby agreed that only one dwelling house shall be erected on said lot either a single or a two-family house, said single house to cost not less than Three Thousand (3000) Dollars, and said two-family house to cost not less than Fifty-five Hundred (5500) Dollars, and that no out building shall be erected upon said lot other than a private garage. Said garage shall be at least thirty (30) feet distance from the rear of the house, and shall not be erected until a dwelling house on said lot is completed. As part consideration for this deed it is hereby further agreed that all lots appearing on said plan shall be sold by the grantee herein, or his heirs or assigns, subject to the same restrictions as are contained in this deed."

Several courts have considered whether a restrictive covenant which limits the number and nature of residential dwelling houses also prohibits the use of the

subject land for commercial parking lots. Courts have construed similar restrictions to limit only the nature of the dwellings and conclude that they did not restrict other uses of the land. *Shaddock* v. *Walters,* 55 N.Y.S. 2d 635 (1945) (holding that a covenant directing that no building should be erected on any portion of the premises except dwelling houses to be used for residential purposes only, did not prohibit use of certain lots subject to the restrictions as a parking field); *Mahrt* v. *First Church of Christ, Scientist,* 75 Ohio L. Abs. 5, 142 N.E.2d 567 (1955), aff'd, 75 Ohio L. Abs. 24, 142 N.E.2d 678, reh. denied, 75 Ohio L. Abs. 27, 142 N.E.2d 680 (1956) (holding that restrictions in a deed purporting to preserve all lots in an allotment as individual building sites, but not providing that such restricted lots were to be used for residences and for no other purpose whatsoever, did not prohibit the use of a restricted lot for off street parking for a church).

A restrictive covenant must be narrowly construed and ought not to be extended by implication. *Neptune Park Assn.* v. *Steinberg,* 138 Conn. 357, 361, 84 A.2d 687 (1951). Moreover, if the covenant's language is ambiguous, it should be construed against rather than in favor of the covenant. *Hooker* v. *Alexander,* 129 Conn. 433, 436, 29 A.2d 308 (1942).

We agree with the trial court that the restrictions do not prohibit the use of the property in question as a parking lot, but only limit the quality and type of dwellings that may be erected thereon. Additionally, we agree with the trial court that a menu board, microphone, lights and a brick trash enclosure are structures and not outbuildings which would be prohibited by the restrictions. "[W]hile a building is always a structure, all structures are not buildings." *Katsoff* v. *Lucertini,* 141 Conn. 74, 78, 103 A.2d 812 (1954); *Hendryx Co.* v. *New Haven,* 104 Conn. 632, 640, 134 A. 77 (1926). Moreover, this is not an instance where the restrictions

expressly prohibit any commercial use of the property or contain an affirmative dedication that the property shall be used for residential purposes only. Cf. *Shorefront Park Improvement Assn., Inc.* v. *King,* 157 Conn. 249, 251, 253 A.2d 29 (1968); *Pulver* v. *Mascalo,* 155 Conn. 644, 646, 237 A.2d 97 (1967); *Baker* v. *Lunde,* 96 Conn. 530, 540, 114 A. 673 (1921). These are permissible structures under the terms of the restrictive covenant.

There is no error.

In this opinion NORCOTT, J., concurred.

BIELUCH, J., dissenting. I do not agree with the majority opinion holding that a paved parking lot for patrons and employees, a lighted menu board, a microphone and speaker for drive-through orders, overhead lights and a brick trash enclosure, all of which are integral and necessary components for the operation of a fast-food restaurant under a franchise from Burger King, are permissible structures under the terms of the restrictive covenant under review.

The language and expressed intent of the applicable restrictions are clear and self defining: "It is hereby agreed that only one dwelling house shall be erected on said lot either a single or a two-family house, said single house to cost not less than Three Thousand (3000) Dollars, and said two-family house to cost not less than Fifty-five Hundred (5500) Dollars, and that no outbuilding shall be erected upon said lot other than a private garage. Said garage shall be at least thirty (30) feet distance from the rear of the house, and shall not be erected until a dwelling house on said lot is completed."

In the present case, there is no need to apply rules of interpretation. The specific restrictions (1) that only one dwelling house be erected on the lot, either a single or a two-family house, and (2) that no outbuilding

be erected upon the lot, except a private garage, clearly limit the use of the lot and the construction upon it. These restrictive covenants are to be read in the light of the circumstances existing at the time they were entered into and the purposes sought to be attained thereby. The subject restrictive covenants were recorded on the land records in 1914, twelve years before the adoption of zoning regulations for the city of Hartford in 1926.[1]

In opening this tract of land for building in 1914, Ernest C. Halliday desired to have it maintained as a one and two-family residential development, which it still is. It was for this reason that his grantees were forbidden to erect any buildings, except one and two-family dwelling houses of a certain cost. The terms one-family and two-family dwellings are in common use in this jurisdiction. There appears to have been no occasion for defining them in our cases. The reason for this may well be that they need no definition. A one-family house is a house designed for occupancy by one family; a two-family house is one designed for occupancy by two families. See *Hooker* v. *Alexander,* 129 Conn. 433, 436, 29 A.2d 308 (1942).

The case of *Mellitz* v. *Sunfield Co.,* 103 Conn. 177, 179, 129 A. 228 (1925), is conclusively on point. The following facts in *Mellitz* parallel those now before this court. A conveyance of property in Bridgeport to one

---

[1] The following zoning regulations were adopted by the Court of Common Council of the city of Hartford on February 8, 1926, and approved on February 9, 1926: "Ordinance Regulating and Restricting Height, Number of Stories and Size of Buildings and other Structures, the Percentage of Lot that may be Occupied, the Size of Yards, Courts and other Open Spaces, the Density of Population and the Location and Use of Buildings, Structures, and Land for Trade, Industry, Residence, and other Purposes and Establishing the Boundaries of Districts for said Purposes and Providing Penalties for Their Violation."

This ordinance was authorized by 23 Special Acts 987, No. 484, Entitled "An Act Authorizing the City of Hartford to Create Zoning Districts."

Linsky in 1915 contained these restrictions: " 'No building shall be erected in said premises, with the exception of lots fronting on Fairfield Avenue, to be used for any other purpose except dwellings or to be occupied by more than two families. No building shall be erected upon the corner of Ellsworth Street and Fairfield Avenue to be occupied for any other purpose except dwellings or to be occupied by more than two families, said corner lot to consist of approximately 130 feet frontage on Fairfield Avenue. No building shall be erected on the balance of the Fairfield Avenue frontage to be occupied for any other purpose except stores and dwellings, said stores to be used for the sale of ordinary merchandise; said buildings on Fairfield Avenue frontage shall not contain more than one family, besides the store.' " Id., 179.

Linsky divided this tract of land into forty-three building lots, of which thirteen fronted on Fairfield Avenue and thirty on Ellsworth Street. The plaintiff acquired lot eleven located on Fairfield Avenue and constructed his dwelling there in accordance with these restrictions. Linsky subsequently conveyed to the defendant lot one, located on the southwesterly corner of Fairfield Avenue and Ellsworth Street, and having a frontage of one hundred thirty feet on Fairfield Avenue and one hundred forty-four feet on Ellsworth Street, and the adjoining lots two and three have a combined frontage of one hundred feet on Fairfield Avenue. Linsky added to the original restrictions in his transfers to the defendant.

The defendant constructed a brick and tile building on lot two, and a cement driveway on lot three. The building was a store used for selling automobile accessories and supplies, and also gasoline, oil and grease. On lots two and three the defendant had also constructed and maintained two underground gasoline tanks, seven gasoline pumps, and a number of air,

water and oil pumps. Lots two and three also had cement walks used for driveway purposes. There was a crushed stone driveway on lot one which was used in connection with the business conducted by the defendant on lots two and three. No building or other structure was erected on lot one. The plaintiff sought to enjoin the defendant's violation of the restrictive covenants on its land. After judgment was rendered for the defendant, the plaintiff appealed. The Supreme Court found error only on the issue decisive of the question now being considered.

The Supreme Court made three rulings, one of which is determinative here. The court first held that the plaintiff could enforce only the restrictive covenants in the conveyance to him. As a prior purchaser, he had no right to enforce Linsky's additional restrictions in the conveyances to the defendant. The second ruling was that the business conducted by the defendant on lots two and three was a store "used for the sale of ordinary merchandise." The third ruling is controlling of the issue under review here.

The court concluded that lot one, the corner lot, was restricted to residential purposes, and that none of it was to be used for business purposes. The defendant had constructed a crushed stone driveway on lot one which it used in connection with its business conducted on lots two and three. Its patrons were those using automobiles and they passed to and from lots two and three over and across lot one. The *Mellitz* court's analysis of the same issue we face in the present case applies directly and decisively to the defendant's proposed establishment on adjacent unrestricted land of a Burger King restaurant with its necessary paved parking lot for patrons and employees, a light menu board, a microphone and speaker for drive-through orders, overhead lights and a brick trash enclosure on either lot one or two: "The direct benefit to such a business from hav-

ing such use of a corner lot is perfectly manifest, and its advertising value to the business is, of course, large. The use defendant makes of lot one makes of it an integral and valuable part of its business. It was a use for a business, and not a residential purpose. If defendant had erected a store covering lot two and had made the approaches to the store across lot one and all deliveries to or from the store in its own trucks as well as its patrons' conveyances were from lot one, could it be said that lot one was not used for business purposes because no building had been erected thereon? If defendant can maintain its driveway for the uses of its business across lot one, we see no reason why it may not maintain its tanks under ground on lot one, or use it for storage purposes. Nor why, if the store on lot two were a lumber or coal business, the lumber or coal might not be piled upon lot one. It is apparent that such uses would violate the primary purpose of the Bartram heirs in restricting the uses of all lots on Ellsworth Street, including lot one, to residential purposes exclusively." *Mellitz* v. *Sunfield Co.,* supra, 184–85.

To reinforce its conclusion in *Mellitz* that the plaintiff there was entitled to an injunction restraining the defendant from using lot one for any purpose in connection with the business conducted on lot two, or for any purpose other than that specified in the restrictions contained in the conveyance of the Bartram heirs to Linsky, the court quoted extensively from *Laughlin* v. *Wagner,* 146 Tenn. 647, 244 S.W. 475 (1922).

In *Laughlin* v. *Wagner,* supra, the defendant owned land fronting on Belvedere Street and Madison Avenue. It was subject to the restriction: "Any house erected on the Belvedere side to be used for residence purposes only, to be two stories or more in height, and to be built on established house lines." Id., 649. The defendant also owned the lot lying between the plot on Belvedere Street and that on Madison Avenue,

which was unrestricted. He proposed building for business uses on his unrestricted land and using the Belvedere Street land as an entrance to his business on the unrestricted lot. The Tennessee court disallowed such a violation, saying: " 'We think a fair interpretation of the restrictive clause in question would permit any use of the Belvedere side of the street which would be consistent with its use for residential purposes only. . . . [W]hatever the character or form of the building, it would be permissible to use it for residential purposes, and if there be no building at all, it could be used for purposes consistent with an incident to its use for residential purposes. From this interpretation it follows that the Belvedere side of this lot could not be made use of in such a way as that the manifest purpose would be to serve the business houses adjacent to it. For example, it could not be used as affording an intentional passageway or entrance into the business house. Any structure, whether strictly a house or not, such as a concrete driveway, which devotes the use of the property to the carrying on of a business, would be violative of this clause, but the use of the lot for decorative purposes, such as flower beds or as a walkway on the lot itself, would not violate the manifest intent and purpose of this clause. In other words, any use of this lot which might be reasonably incident to its use for residential purposes is permissible, but it is not permissible to put the lot into service as an incident to the business houses on the adjacent portion of the lot. . . . This does not mean that the defendants may not use it for flower beds or for walkways, but it does mean that no portion of the Belvedere side can be used as a means of service to the business being conducted upon the adjacent lots or portions of the lot.' " *Mellitz* v. *Sunfield Co.*, supra, 185–86, quoting *Laughlin* v. *Wagner*, supra, 658–59.

For these reasons, I would hold that a paved parking lot for patrons and employees, a light menu board,

a microphone and speaker for drive-through orders taken from a standing vehicle on an installed driveway, overhead lights and a brick trash enclosure for the collection of refuse from the restaurant operation until it can be removed by trash trucks, are integral and necessary installations and components of the fast-food business to be known as Burger King and their location on either lot one or lot two would constitute a violation of the restrictive covenants upon the land.