JOHN A. CONTEGNI ET AL. *v.* C. MEYRICK
PAYNE ET AL.
(6493)

BORDEN, DALY and O'CONNELL, Js.

Argued October 13, 1988—decision released April 4, 1989

*Charles A. Deluca,* for the appellants (plaintiffs).

*Leo Gold,* for the appellees (defendants).

BORDEN, J. The plaintiffs[1] appeal from the judgment rendered in favor of the defendants on the plaintiffs' complaint seeking an injunction to enforce a restrictive covenant. The dispositive issues are whether the trial court erred (1) in concluding that the plaintiffs had failed to prove the existence of a uniform plan of development, and (2) in concluding that the covenant in the defendants' deed did not limit the number of dwelling houses that could be built upon the defendants' lot. We find error in part.

Certain facts are not in dispute. The plaintiffs and the defendants are residents of the Shippan Point area of Stamford. All the parties own property that fronts on either Rogers Road or Saddle-Rock Road. The parcels of land presently owned by the parties were at one time owned by the Shippan Point Land Company (SPLC). The present litigation resulted from the defendants' attempt to convey a subdivided portion of their lot to a purchaser who intended to build a house thereon.

In 1904, SPLC purchased from Henry Harris, a trustee for the estate of Moses Rogers, a large parcel of land (Harris purchase) in the southwesterly tip of Shippan Point. The large majority of this property fronted on Long Island Sound or Stamford Harbor, but a sizeable portion was completely inland, bordered on three sides by Ocean Drive West and Verplanck Avenue and separated from the larger waterfront property by Ocean Drive West. SPLC conveyed the northernmost portion of the Harris purchase to Bartholomew

---

[1] The complaint names Madeline D. Contegni, John A. Contegni, Judith Egbert, Frank Dean, Delores Dean, Verna Green, Robert Green, Diane Berol Saxton, and "The Fidelity Trust Company and Kenyan Gillespie, co-trustees u/a Doris K. Gillespie" as plaintiffs. Diane Berol Saxton subsequently withdrew as a plaintiff. The complaint names C. Meyrick and Margaret C. Payne as defendants. The Paynes jointly own the lot adjacent to that of the plaintiffs Contegni.

Jacob, by four separate deeds executed between 1908 and 1910. In 1908, SPLC also conveyed a large parcel situated on the southeast extremity of the Harris purchase to Elbert Barlow.

Beginning in 1909, SPLC augmented its remaining waterfront property between the Jacob and Barlow lots by roughly doubling its size through a dredging and landfill operation. (This area, consisting of SPLC's waterfront property, including the landfill, and bounded by Jacob's and Barlow's property, is hereinafter referred to as the "developed area.") SPLC built two private roads on the property, which were later named Rogers and Saddle-Rock Roads. A map, entitled "South-Westerly Tract of the Shippan Point Land Co. and Private Roads thereon at Shippan Point, Stamford, Conn.," was filed in the Stamford town clerk's office, and was designated "Map 312." This map shows the developed area, bounded by the Jacob and Barlow lots. See Appendix, p. 68.

In 1911, SPLC began transferring title by separate deeds to various lots within the developed area. Twenty-five building lots were eventually conveyed out of the developed area by SPLC; thirteen bordered on Long Island Sound or Stamford Harbor and twelve were inland. The deeds for these lots were substantially uniform; all of these deeds, along with those for the Barlow and Jacob lots, contained first cost provisions[2] for the various buildings that could be built pursuant to the covenants and all restricted the property conveyed to residential uses.

In 1929, SPLC conveyed one of the inland lots in the developed area to Marguerite Daly, the defendants' predecessor in title. The language of the restrictive covenants of Daly's deed was unique in that her deed

[2] A first cost provision is a covenant placed in a deed to specify the minimum construction cost of a structure to be erected on the conveyed land.

provided in part that "there shall not be erected or maintained thereon any building other than (1) *one family dwelling* . . . ." (Emphasis added.) The majority of the deeds from SPLC had employed a slightly different phrase: "there shall not be erected or maintained thereon any buildings other than (1) *a dwelling house* arranged for and occupied by a single family . . . ." (Emphasis added.) Three months later, SPLC conveyed the lot adjacent to Daly's to George Brown, predecessor in title to the plaintiffs Madeline D. and John A. Contegni. Brown's deed was typical of three others in the developed area in that it contained yet another permutation of the restriction: "there shall not be erected or maintained thereon any buildings other than (1) *one dwelling house* arranged for and occupied by a single family . . . ." (Emphasis added.) The lot conveyed to Brown was SPLC's last buildable lot in the developed area.

A 1922 map of Shippan Point shows that, in addition to certain still unsold lots on the land it had acquired in the Harris purchase, SPLC had title to numerous other lots on the Shippan Point peninsula. In March, 1982, the defendants purchased the property once owned by Daly and received a deed which stated that the premises were "conveyed subject to any and all . . . restrictive covenants and agreements of record . . . ." On December 31, 1986, the defendants conveyed a subdivided portion of their property, and the plaintiffs brought the present action to enjoin the building of a second dwelling house on the property. The construction of a second dwelling house on the property, the plaintiffs claimed, would violate the deed restrictions mentioned above that the plaintiffs argued allowed only a single house to be built on the defendants' lot. After a court trial, the court rendered judgment for the defendants. This appeal followed.

## I

As a preliminary matter, we ascertain the appropriate scope of review for the issues on appeal, all of which ultimately concern the intent of the grantor, SPLC. "Although in most contexts the issue of intent is a factual question on which our scope of review is limited; see, e.g., *Finley* v. *Aetna Life & Casualty Co.,* 5 Conn. App. 394, 408, 499 A.2d 64 (1985), rev'd on other grounds, 202 Conn. 190, 520 A.2d 208 (1987); the determination of the intent behind language in a deed, considered in the light of all the surrounding circumstances, presents a question of law on which our scope of review is plenary. *Kelly* v. *Ivler,* 187 Conn. 31, 39, 450 A.2d 817 (1982); *Marion Road Assn.* v. *Harlow,* 1 Conn. App. 329, 332, 472 A.2d 785 (1984)." *Grady* v. *Schmitz,* 16 Conn. App. 292, 295–96, 547 A.2d 563 (1988). Thus, when faced with a question regarding the construction of language in deeds, "the reviewing court does not give the customary deference to the trial court's factual inferences." *Marion Road Assn.* v. *Harlow,* supra.

## II

The plaintiffs first claim that the trial court erred in determining that a uniform or general plan of development did not exist with respect to the developed area, the tract of land in question. We disagree. "In general, restrictive covenants fall into three classes: (1) mutual covenants in deeds exchanged by adjoining landowners; (2) uniform covenants contained in deeds executed by the owner of property who is dividing his property into building lots under a general development scheme; and (3) covenants exacted by a grantor from his grantee 'presumptively or actually for the benefit and protection of his adjoining land which he retains.' *Stamford* v. *Vuono,* 108 Conn. 359, 364, 143 A. 245 (1928)."

*Grady* v. *Schmitz,* supra, 296. With respect to the second class of covenants, any grantee under such a general or uniform development scheme " 'may enforce the restrictions against any other grantee.' *Pulver* v. *Mascolo,* 155 Conn. 644, 650, 237 A.2d 97 (1967)." *Marion Road Assn.* v. *Harlow,* supra, 333.

The doctrine of the enforceability of uniform restrictive covenants is of equitable origin. The equity springs from the presumption that each purchaser has paid a premium for the property in reliance upon the uniform development plan being carried out. While that purchaser is bound by and observes the covenant, it would be inequitable to allow any other landowner, who is also subject to the same restriction, to violate it. *Whitton* v. *Clark,* 112 Conn. 28, 35, 151 A. 305 (1930).

This simple explanation is most persuasive where a challenged restriction is contained in a deed to an entire tract through which title to all lots can be traced, or where the restriction is stated on a map of the tract referred to in the conveyances. Id. Where, as in this case, the uniform plan of development must be divined from the language of the covenants inserted in the deeds of various owners of lots, the situation is more complicated and it is necessary to determine "the intent of the owner in creating the restrictions upon any lot to make the benefit of them available . . . to the owners of the other lots in the tract." Id. The intent of the grantor must be determined by reading the deeds in light of the surrounding circumstances attending the transactions. *Marion Road Assn.* v. *Harlow,* supra. " 'The meaning and effect of the [restrictions] are to be determined, not by the actual intent of the parties, but by the intent expressed in the deed, considering all its relevant provisions and reading it in the light of the surrounding circumstances . . . .' *Kelly* v. *Ivler,* [supra]." *Marion Road Assn.* v. *Harlow,* supra, 332; *Grady* v. *Schmitz,* supra, 296.

There are several factors that help to establish the existence of a common grantor's intent to develop the land according to a uniform plan. These factors include (1) the common grantor's selling or stating an intention to sell an entire tract of land, (2) the common grantor's exhibiting a map or plot of the entire tract at the time of the sale of one of the parcels, (3) the actual development of the tract in accordance with the restrictions, and (4) a substantial uniformity in the restrictions imposed in the deeds executed by the common grantor. 5 R. Powell, Real Property § 672, p. 60-26.

Our review of the record does not persuade us that SPLC, the original grantor, intended to impose a uniform plan of development *on the tract in question.* Moreover, because we agree with the trial court that "this is a rather close case in many ways," it is appropriate to set forth completely our analysis of the factual issues presented. We begin by examining the factors set out in 5 R. Powell, supra.

Regarding the first factor, namely, the common grantor's intent to sell the entire tract, we note that by 1931 SPLC had conveyed its entire interest in the developed area. Newspaper accounts dating from 1910 and 1911 and introduced into evidence traced the evolution of the tract and repeatedly noted SPLC's intention to develop the tract for subdivision and sale by lot. This factor, therefore, strongly supports the plaintiffs' claim. *Whitton* v. *Clark,* supra, 36.

Regarding the second factor, namely, the common grantor's exhibiting a map or plat of the entire tract at the time of the sale of one of the parcels, the plaintiffs relied upon the aforementioned map 312,[3] which was drawn and filed in the land records of the Stamford town clerk's office in 1910. Entitled "Map Showing South-Western Tract of The Shippan Point Land

---

[3] This map is reproduced in the appendix, infra, p. 68.

Co. and Private Roads Thereon Shippan Point, Stamford, Conn.," it displays the developed area, bounded by Long Island Sound, Stamford Harbor, the property of B. Jacob, Ocean Drive Road West, and the property of E. S. Barlow. As its name implies, the map shows the private roads in the developed area but does not indicate the subdivision of the area into lots, nor does it indicate the location of the marble monuments the plaintiff claims SPLC placed on the area to establish lot lines.

The map was referred to in several early deeds of lots in the developed area, but the plaintiff presented no evidence that this map, or any other, was "exhibit[ed] . . . at the time of sale of one of the parcels"; 5 R. Powell, supra, § 672; or that SPLC relied upon the map to depict an area to be subjected to a uniform plan of development. The record reveals that SPLC's sole purpose in creating this map was to describe the position of the private roads in the developed area. Once those roads were named, the deeds refer to the roads by name and do not thereafter mention the map. Thus, at best this factor is neutral.

The third factor, whether the actual development of the claimed tract has occurred in accordance with the uniform plan, was the subject of much contention by the parties. The trial court pointed to a number of facts to support its conclusion that the tract's development had not followed a uniform plan, namely, (1) that several lots in the tract originally conveyed out by SPLC have been subdivided, and (2) that on many lots a portion of the garage or carriage house has been rendered habitable and rented to third parties, in apparent violation of the restriction to one "dwelling home" per lot. We are not persuaded by either of these findings.

It is worth emphasizing that at this juncture in our analysis we examine the development of the area in

question to determine whether SPLC intended the area's development to follow a uniform plan. 5 R. Powell, supra, § 672. Events too distantly removed in time from the original SPLC conveyances to reflect SPLC's intent one way or the other are not relevant to this issue, although they would bear on the equitable issue of the enforceability of the covenants due to changed circumstances. See, e.g., *Grady* v. *Schmitz,* supra. Many of the deviations from the claimed uniform plan cited by the defendants and the trial court occurred after SPLC conveyed out its last lot in the developed area in 1931. We therefore give these deviations less weight than they were given by the trial court. It is unrealistic to require that this factor be fulfilled only by proof that a neighborhood has been frozen in amber for seventy-five years.

With regard to the partial conversion of several garages and carriage houses in the developed area to habitable quarters, we note first that the concept of providing living quarters for servants or others above the garage was not unheard of in the first decades of the century. See *White & Hess, Inc.* v. *Schwartzbacker,* 110 N.J. Eq. 115, 116, 159 A. 311 (1932). ("Partitioning the rear [of a building that is structurally a garage] into rooms and separating them from the automobile stall does not alter the character of the structure; many modern garages are thus subdivided and occupied by the help without loss of distinction.") The covenant authorizing the construction of garages does not expressly or by implication forbid the maintenance of living quarters in the garage.[4] We can find no support in the record for the defendants' position that the par-

---

[4] The relevant restriction in all the deeds to property in the developed area permitted the construction of "a garage or automobile house for the motor vehicles of the occupants of said land only." We read this restriction to limit the class of persons entitled to garage their vehicles on the premises. It does not, in our view, limit the use of the garage strictly to the shelter of motor vehicles.

ties to the original conveyances would have viewed as somehow oxymoronic the notion of a "habitable garage."

Furthermore, the original deeds from SPLC without exception contain first cost restrictions for all the structures permitted on the lots; from these provisions it is evident that the difference in size and appointment between the dwelling house and the carriage house or garage was to be significant.[5] This pattern has been followed; none of the carriage houses or garages with habitable space approaches the size of the dwelling house on the same lot. In character, they remain essentially buildings accessory to the dwelling house. To view these structures as dwelling houses in their own right overlooks the scheme suggested by the first cost provisions and thus strains credulity.

The court also noted several subdivisions of SPLC-deeded lots as a divergence from the deed restrictions. It is true that the lot boundaries within the tract have not remained static. In two separate instances, four lots originally conveyed by SPLC were combined by a subsequent owner who resubdivided them along different interior lot lines. The original deeds to these lots, however, did not contain restrictions as to their size and shape. In the instance where the four combined lots were resubdivided into four lots, the mere shifting of lot lines cannot be considered a violation of the deed restrictions. *Hickson* v. *Noroton Manor, Inc.,* 118 Conn. 180, 188–90, 171 A. 31 (1934). The other instance of the subdivision of combined lots, which

---

[5] The deeds reveal that the ratio between the first cost of the dwelling house (average $8000 to $10,000) and the first cost of the carriage house or stable ($2000) was 4 or 5 to 1. Given that SPLC no doubt reflected in these first cost restrictions its expectation that the affluent purchasers of these lots would erect large, well-appointed homes, it follows that the carriage houses that could be built for one quarter the cost of these homes would be impressive structures in their own right, which for the money could easily contain servant's quarters.

yielded one more buildable lot than had been originally incorporated into the combined lot, occurred years later in 1978. By this time, the entire Shippan area was developed and SPLC had been out of business for twenty-seven years. It is difficult to contend that this 1978 subdivision somehow reflects SPLC's intent. For our present purpose, it is therefore entitled to little weight. We conclude that this third factor supports a finding of a uniform plan.

We turn to the fourth factor, the uniformity of the restrictions imposed in deeds. Such uniformity is especially important to a finding that a common plan of development exists. 5 R. Powell, supra, § 672, p. 60-27. To satisfy this factor, it is not necessary that the restrictions in every deed be found to be identical, as long as the scheme of creating a uniform subdivision is still apparent. Id.; see also *Thodos* v. *Shirk*, 248 Iowa 172, 79 N.W.2d 733 (1956). Nor is it necessary, at this step in our inquiry, to ascertain the precise meaning of the restrictions, because we seek at this step to determine whether the common grantor intended to *create* a uniform plan of development, not whether the skill of the grantor's scrivener still renders such a plan enforceable today.

SPLC conveyed the lots in the developed area through the execution of twenty-five deeds.[6] The restrictions in these deeds are not identical. Nonetheless, no buildable lot was conveyed without a deed restriction on the first cost of the dwelling house, carriage house or stable, and garage that could be built on the property. Every deed explicitly restricts the burdened property to residential use. Even under the defendants' reading of the covenants it is impossible

---

[6] This figure excludes several deeds of small strips of property conveyed to augment previously sold parcels.

to avoid the conclusion that no building that was not a dwelling house, a stable or carriage house, or a garage could be erected on any lot.

The most significant variation in the deed restrictions is in the description of the house that could be erected on a given lot. In some deeds this phrase reads "(1) *a* dwelling house"; in others, "(1) *one* dwelling house." (Emphasis added.) The defendants' deed employs "(1) one family house," while one deed specifically prescribes "(1) one (1) dwelling house." Significantly, of the last eight deeds conveying buildable lots, six employ some permutation of the "(1) *one* dwelling house" language; only two refer to "(1) *a* dwelling house." In earlier deeds the "(1) a dwelling house" language predominates. Were the changes in the house description accompanied by like changes in other relevant passages in the deeds, we would be more inclined to agree with the defendants that these changes were significant. The other passages contained in the deeds that would be relevant to a judicial construction of the restriction at issue, however, remain uniform and constant from the earliest SPLC deed in the tract to the latest. We find the inference to be overwhelming that the grantor intended these restrictions to be uniform and, for the purposes of this analysis, we find them to be uniform.

Our application of the four factors cited in Powell's treatise to the facts of the case leads us to conclude that it is more likely than not that SPLC intended to establish a uniform plan of development for an area that included the developed area. This conclusion does not end our analysis, however. We must still determine, if we can, the precise boundaries of the area that SPLC intended to include in the uniform plan.

The area covered by a uniform plan must be so defined as to be clearly ascertainable; 5 R. Powell,

supra, § 672, p. 60-25; so that a judgment affecting rights arising under such a scheme will be susceptible of enforcement. A judgment must so dispose of the matters in issue that the parties and other persons affected will be able to determine with reasonable certainty the extent to which their rights and obligations have been determined. Where a judgment lacks such certainty and is unintelligible, it is a nullity. See *Lake Garda Improvement Assn.* v. *Battistoni,* 155 Conn. 287, 295–96, 231 A.2d 276 (1967); see also, *In re Rockett's Estate,* 348 Pa. 445, 35 A.2d 303 (1944). Furthermore, "[a] judgment must be rendered according to the facts proved. *Pitkin* v. *New York & N.E.R. Co.,* 64 Conn. 482, 490, 30 A. 772 (1894)"; *Boland* v. *Catalano,* 1 Conn. App. 90, 92, 468 A.2d 1238 (1983). Although we have concluded that the balance of the four factors previously discussed favors the plaintiffs, unless the boundaries of the area of uniform development can be ascertained from the evidence admitted at trial, the plaintiffs' case must nonetheless fail.

The area claimed by the plaintiffs to be covered by a uniform plan of development is bounded on the west by Stamford Harbor, on the south by Long Island Sound, on the east by Ocean Drive and by property once owned by Elbert Barlow, and on the north by property once owned by Bartholomew Jacob. The plaintiffs rely upon a number of facts, including map 312, to prove that SPLC intended to impose a distinct and uniform plan of development on this particular area.

We find that the evidence offered by the plaintiffs does not establish that the claimed area *alone* was to be the subject of a uniform plan. Map 312 does not support their claim. Entitled "Map Showing Southwesterly Tract of the Shippan Point Land Co. and Private Roads thereon at Shippan Point, Stamford, Conn.," the map was drawn and recorded in 1910, and shows the area of the alleged uniform plan, bounded

by properties marked "B. Jacob" and "E. S. Barlow." The map does not indicate the proposed lot lines for the new development. It makes no reference to a uniform plan. The only conceivable reason the B. Jacob and E. S. Barlow properties were separately designated is that SPLC had *already sold them* but had not yet in 1910 sold any of the land between Barlow's parcel and Jacob's parcel. A number of early deeds of lots within the claimed area made reference to the map, but only for the purpose of identifying Rogers and Saddle-Rock Roads, which at the time of these conveyances had not yet been named. Conveyances of lots within the area made after the roads were named make no reference to map 312 at all. Thus its only purpose appears to have been to identify and locate the new roads running through the developed area. "[I]n the interpretion of maps and plats intention will not be inferred from symbols of uncertain meaning . . . ." *Hamilton* v. *CCM, Inc.*, 274 S.C. 152, 157, 263 S.E.2d 378 (1980). As we will not extend the reach of a restrictive covenant by implication; *Marion Road Assn.,* supra; it would be inconsistent with that principle to extend the reading of an ambiguous map by implication to find that a uniform plan of development is recited thereon.

The other factors cited by the plaintiffs are similarly of little assistance. A thorough search of the record, transcripts and exhibits fails to reveal *a single characteristic* that was both unique to the lots within the claimed area of uniform development *and* applicable to all or substantially all the lots within the area. The deed under which SPLC acquired the area now in question conveyed several large parcels in addition to the claimed area of uniform development. Thus, the restrictive covenants in that deed applied to an area larger than the claimed area. The deed restrictions discussed at length above, although present in all the deeds of

buildable lots within the claimed area, were also present in Barlow's deed and in Jacob's deed. A 1922 map shows that SPLC owned numerous individual lots scattered throughout the Shippan Point area, outside of the claimed area. In short, the plaintiffs have failed to refer this court to any reason, defensible in logic and law, for finding that SPLC intended to delimit this area of uniform development in the way the plaintiffs have contended. Therefore the plaintiffs may not enforce the covenants in the defendants' deed under the theory of a uniform plan of development.

## III

The plaintiffs John A. and Madeline D. Contegni also claim that the trial court erred by refusing to enforce the restrictive covenant in the defendants' deed under a "retained land" theory. We agree.

"Where the owner of two adjacent parcels conveys one with a restrictive covenant and retains the other, whether the grantor's successor in title can enforce, or release, the covenant depends on 'whether [the covenant] was made for the benefit of the land retained by the grantor in the deed containing the covenant, and the answer to that question is to be sought in the intention of the parties to the covenant expressed therein, read in light of the circumstances attending the transaction and the object of the grant.' *Bauby* v. *Krasow,* 107 Conn. 109, 112–13, 139 A. 508 (1927). If the covenant is for the benefit of the retained land it runs with the land and may be enforced by the successor in title to the retained land against the successor in title to the conveyed land, on the principle which prevents one with notice of the just rights of others from defeating those rights. *Stamford* v. *Vuono,* 108 Conn. 359, 365, 143 A. 245 (1928)." *Marion Road Assn.* v. *Harlow,* 1 Conn. App. 329, 335, 472 A.2d 785 (1984).

By September, 1929, SPLC held title to only two parcels of land within the developed area. The parcels were adjacent to each other. On September 21, 1929, SPLC conveyed one of these parcels to the defendants' predecessor in title, Margaret Daly, by a deed that contained the following restrictive covenant: "That the land hereby conveyed shall be used for private residence purposes only, and that there shall not be erected or maintained thereon any buildings other than (1) one family dwelling, the first cost of which shall not be less than $10,000 (2) a stable or carriage house for the horses and vehicles of the occupants of said land only . . . (3) a garage or automobile house for the motor vehicles of the occupants of the said land only . . . ." Another provision of the deed states: "This deed is delivered and accepted upon the express agreements and covenants . . . which shall run with the land and be binding upon the grantee and all persons claiming or to claim said land or any part or parcel thereof under the grantee, and shall inure to the benefit of the grantor and all its grantees of land upon said Shippan Point and each of them . . . ." SPLC still held title to the adjacent parcel. The following year SPLC conveyed this last buildable parcel to George Brown, the predecessor in title of the Contegnis.

As we have seen, the covenant in Daly's deed was exacted by SPLC from its grantee, presumptively or actually for the benefit of the remaining adjoining land retained by SPLC. As such, it is enforceable by the Contegnis, who are the successors in title to the assigns of SPLC to this particular parcel of land, against the defendants, who are the subsequent purchasers of the property burdened. Because SPLC conveyed the parcels that ultimately came into the possession of the other plaintiffs *prior* to the Daly conveyance, the other plaintiffs do not have a valid claim under this theory. *Baker* v. *Lunde,* 96 Conn. 530, 536–37, 114 A. 673

(1921).[7] We conclude, moreover, from the language in the deed from SPLC to the defendants' predecessor, and from the surrounding circumstances, that it was the intent of SPLC in exacting the covenant to benefit the adjoining land that it retained. *Grady* v. *Schmitz,* 16 Conn. App. 292, 296, 547 A.2d 563 (1988).

A further examination of the facts bolsters this reading of the deed from SPLC to Daly. Because SPLC exacted such a covenant from its grantee, the covenant must be viewed as " 'presumptively . . . for the bene-

---

[7] Because we hold that the Contegnis may enforce the restrictions in the defendants' deed under this theory, we must briefly address the defendants' alternate ground for affirming the trial court's judgment, namely, that the present action is barred by the principles of res judicata or collateral estoppel. " '[R]es judicata or claim preclusion prevents a litigant from reasserting a claim that has already been decided on the merits. Collateral estoppel, or issue preclusion, prevents a party from relitigating an issue that has been determined in a prior suit.' *Gionfriddo* v. *Gartenhaus Cafe,* 15 Conn. App. 392, 401–402, 546 A.2d 284, cert. granted, 209 Conn. 809, 548 A.2d 437 (1988)." *Virgo* v. *Lyons,* 209 Conn. 497, 501, 551 A.2d 1243 (1988).

The defendants base this claim on the following facts. In 1981, the Superior Court decided the case, *Saxton* v. *Fahey,* Superior Court for the judicial district of Stamford-Norwalk, docket number CV-0040996 (June 22, 1981), in which the plaintiffs attempted to enforce the restrictions in the deed of the successor in interest to Bartholomew Jacob by arguing that an area of Shippan Point including the developed area and the land once owned by Jacob was covered by a uniform plan of development by virtue of uniform restrictions inserted in the relevant deeds of SPLC. The plaintiffs could also have asserted the retained land theory but did not. One of the plaintiffs in *Saxton* v. *Fahey,* Judith Egbert, is also a plaintiff in the present case.

We find no merit to either the res judicata or the collateral estoppel claim for two reasons. First, the Contegnis were neither a party to, nor in privity with a party to, the earlier litigation. They therefore had no opportunity to litigate in a prior proceeding the issue or claim sought to be precluded in the subsequent proceeding. See *East Lyme* v. *Waddington,* 4 Conn. App. 252, 255, 493 A.2d 903, cert. denied, 197 Conn. 811, 499 A.2d 61 (1985). Second, the fact that Judith Egbert could have asserted the retained land theory in the earlier case and thus might well be barred from asserting it in the present case; see *Lehto* v. *Sproul,* 9 Conn. App. 441, 444, 519 A.2d 1214 (1987); is of no moment because only the Contegnis can assert that claim here. *Grady* v. *Schmitz,* 16 Conn. App. 292, 296, 547 A.2d 563 (1988).

fit and protection of [SPLC's] adjoining land which [SPLC] retain[ed].' [*Stamford* v. *Vuono,* supra], 364''; *Grady* v. *Schmitz,* supra, 297. The language of the deed explicitly states that the covenants are to run with the land and be binding on the grantee's successor and her assigns and will be enforceable by the grantor and its assigns. The deed further explicitly states that the conveyed parcel may be used only for residential purposes. This ''indicated an intent to preserve the residential character and value of the land retained by [SPLC]. Certainly such a restriction inured to [SPLC's] benefit as the eventual seller of [its] retained land, since it would affect the value of . . . the land . . . .'' Id.

The defendants, citing *Stamford* v. *Vuono,* supra, maintain that the retained land theory requires that the grantor expressly covenant to restrict the use of its remaining land, and that the Contegnis cannot prevail under this theory because SPLC made no such covenant in its deed to Daly. Our case law does not support this argument. The retained land theory requires that the grantor exact ''covenants from his grantee . . . for the benefit and protection of his adjoining land which he retains.'' *Stamford* v. *Vuono,* supra. ''[T]here is no mutuality between the grantees, if there are more than one, and therefore no right in one grantee to enforce the restrictions against another grantee on that theory. But the original grantor (the owner of the property benefited) and his assigns may enforce them against subsequent purchasers of the property burdened.'' Id., 365. Neither *Stamford* v. *Vuono,* supra, nor any other more modern case construing a covenant under this theory; see *Grady* v. *Schmitz,* supra; *Marion Road Assn.* v. *Harlow,* supra; requires the parties to the original transaction to have burdened their adjoining lands with *mutually* restrictive covenants.

Although we have concluded that the Contegnis are entitled to enforce the restrictive covenant in the defendants' deed, the precise scope and meaning of that restriction remains to be ascertained. The defendants argued, and the trial court found, that "the plaintiffs cannot prevail on [the retained land theory] because of the lack of a clear covenant restricting development to one house per lot." We disagree.

Language in a deed that purports to create a restrictive covenant must be construed in light of the circumstances attending and surrounding the transaction. *Baker* v. *Lunde,* supra, 539. " 'The meaning and effect of the reservation are to be determined, not by the actual intent of the parties, but by the intent expressed in the deed, considering all its relevant provisions and reading it in the light of the surrounding circumstances . . . .' " *Kelly* v. *Ivler,* 187 Conn. 31, 39, 450 A.2d 817 (1982). "The primary rule of interpretation of such [restrictive] covenants is to gather the intention of the parties from their words, by reading, not simply a single clause of the agreement but the entire context, and, where the meaning is doubtful, by considering such surrounding circumstances as they are presumed to have considered when their minds met." *B. T. Harris Corporation* v. *Bulova,* 135 Conn. 356, 361, 64 A.2d 542 (1949).

We begin with the language itself. The deed conveying the property to the defendants' predecessor forbade the erection of any building on the premises except: "(1) one family house . . . (2) a stable or carriage house . . . (3) a garage or automobile house . . . ." The defendants maintain that the phrase "one family house" limits the type, but not the number, of dwelling houses that might be built on the property. Thus, they argue that single-family houses, as opposed to duplexes or multi-family structures, may be built on the property. The plaintiffs, on the other hand, see the

word "one" as restricting both the number and type of houses on the lot, namely, one single-family house. We agree with the plaintiffs.

The plaintiffs' reading makes more sense gramatically; the first word after each parenthesized numeral would then be an article. On the other hand, reading the word "one" to mean "single," as the defendants suggest, produces, "except (1) *single* family house . . . (2) a stable . . . (3) a garage . . . ." (Emphasis added.) The more sensible reading of the restriction, in isolation, is that of the plaintiffs.

Our examination of the entire deed, and the circumstances surrounding its drafting, does little to sway our belief that the plaintiffs' reading is correct. The defendants draw our attention to several instances in the deed where the scrivener seemed to imply the possibility that more than one dwelling house could permissibly stand on the lot. The deed requires that "*no* dwelling house" may encroach within forty feet of the highway; "a physician or surgeon who may own or occupy *a* dwelling house upon said land" may display a sign. (Emphasis added.) The covenants in the deed bind the grantee "and all persons claiming or to claim said land *or any part or parcel thereof* under the grantee. . . ." (Emphasis added.) We are not persuaded.

First, we agree with the plaintiffs' characterization of the "part or parcel" clause as mere "belt and suspenders" language, the intent of which was to insure the continued enforceability of the covenants in the event of a judicial partition of the property. Second, the other quoted clauses may be read to countenance the same possibility; just as the article "a" may or may not impose a numerical limitation; see, e.g., *Deutsch* v. *Mortgage Securities Co.,* 96 W. Va. 676, 679, 123 S.E. 793 (1924); the phrase "no dwelling house" may stand within forty feet of the highway, may refer to one dwelling house or ten. Thus, the examples relied upon by

the defendants fail to negate the natural inference we draw, that "one family house" imposes both a numerical and type limitation.

Viewing the issue in yet a larger context, we note that both the deeds to Daly and Brown were among the last by which SPLC conveyed property out of the developed area. As we discussed above, six of the last eight deeds restrict building on the conveyed property to "one dwelling house arranged for and occupied by a single family" and certain outbuildings. The deeds employing this language provide a useful counterpoint to the defendants' position. Clearly, the phrase "one dwelling house arranged for and occupied by a single family" admits of only one reasonable construction. Yet, the deeds containing that unambiguous version of the restriction employ the same, ambiguous version as that found in the Daly deed of the other restrictions, such as those governing the front and rear setbacks and the physician's sign. This further undercuts the defendants' position by indicating to us that the ambiguous provisions, such as the setback limits and the allowance of a physician's sign, were to be read to harmonize with the clause describing the dwelling house and were not to control that clause's meaning.

The restriction in the Daly deed inured to the benefit of the adjacent, retained land of the grantor, SPLC. Thus the Contegnis, as SPLC's successors in title to the retained land, may enforce the restriction to enjoin the construction of more than one dwelling house on the defendants' property.

There is error in part, the judgment is set aside and the case is remanded with direction to render judgment for the plaintiffs Madeline D. and John A. Contegni only, and to render judgment for the defendants with respect to the other plaintiffs.

In this opinion the other judges concurred.