# FRANK DASILVA ET AL. *v.* RICHARD J. BARONE, JR., ET AL.
## (AC 24379)

Dranginis, Bishop and Dupont, Js.

Argued February 13—officially released June 15, 2004

*Joseph M. Brophy*, for the appellants (defendants).

*Robert A. Fuller*, with whom was *Nancy D. Gallagher*, for the appellees (named plaintiff et al.).

*Opinion*

DUPONT, J. The defendants, Richard J. Barone, Jr., and Sharmaine Barone, appeal from the judgment of the trial court granting a permanent injunction to the plaintiffs[1] that enjoined the defendants from keeping horses and from building a structure to house horses on their property in Fairfield. The primary issue in this appeal is the enforceability of restrictive covenants allegedly prohibiting the defendants from such uses.

The plaintiffs and the defendants are the owners of lots as shown on a subdivision map recorded in the Fairfield land records. The plaintiffs filed a two count complaint alleging (1) a violation of a restrictive covenant in the defendants' deed and (2) the maintenance of a nuisance, and sought to enjoin the defendants from keeping horses and erecting structures to house horses on the defendants' property.[2] On appeal, the defendants claim that the court improperly ruled (1) that the restrictive covenants contained in the defendants' deed were enforceable, and (2) that the language of the restrictive covenants prohibited structures suitable to maintain

---

[1] The plaintiffs in this action originally included Frank DaSilva, Percy Russell, Diane Ames, David Barber, Joyce Barber, Everett Cooper, Karen Cooper, Judith Kimbell, James McMahon, Joan McMahon, Christel I. Kehoe and Robert Kehoe. The common grantor in their chain of title is Treasure Homes, Inc. Other plaintiffs were Albert Devejian, Martha Devejian, Fred Tarter and Lois Tarter. The predecessors in title to the Devejians include Scot-Alan Corporation and Ingham Hill Corporation, but not Treasure Homes, Inc. The Tarters own a tract of land abutting the defendants' land, but that tract was not part of the original subdivision at issue in this case. Russell and Ames later withdrew as parties and therefore are not parties to this appeal.

[2] The court denied injunctive relief as to the nuisance count, and no argument is made on appeal by the plaintiffs as to that denial.

horses and the keeping of horses.[3] We agree with the defendants that the restrictive covenants are not enforceable and reverse the judgment of the trial court.

The following facts are relevant to the defendants' appeal. The defendants' lot is shown on a twenty-two lot subdivision map prepared by the Scot-Alan Corporation (Scot-Alan) and approved by the Fairfield planning commission. The map contains no mention of any restrictive covenants, and Scot-Alan did not record any separate agreement or declaration relating to restrictive covenants that would apply to the lots delineated on the map. All of the subsequent conveyances by Scot-Alan were made with reference to that map. Of the twenty-two lots, fifteen were conveyed, by individual deed, at various times, to Treasure Homes, Inc. (Treasure Homes),[4] without any restrictive covenants. Scot-Alan conveyed four lots to the Ingham Hill Corporation, one to the Park Lane Corporation and two in foreclosure actions. Only one deed from Scot-Alan, that to Ingham Hill Corporation transferring four lots, contained a restrictive covenant at all. That deed bars any construction except for a private residence and a garage or other structure incident to a private residence. It does not bar any types of animals from being kept on the property. Thus, no conveyance from Scot-Alan of any lot on its recorded map contained any restrictive covenant prohibiting the keeping of horses.

The fifteen lots owned at various times by Treasure Homes do not all directly abut one another. Treasure Homes never held title to more than four of the fifteen

---

[3] Because our decision on the defendants' first claim is dispositive, we need not address their second claim as to the particular language used in the restrictive covenants.

[4] George Bossert, the president of both Scot-Alan and Treasure Homes, the predecessors in title to certain of the plaintiffs; see footnote 1; signed all of the conveyances for both corporations. There are no other facts to indicate that the two corporations should be treated as one entity.

lots at any one time. On at least six separate occasions, individual lots were conveyed by Treasure Homes to different individual owners on the same day as Scot-Alan conveyed the lots to Treasure Homes. The remaining nine lots were owned by Treasure Homes for time periods ranging from eight months to twenty months before they were conveyed to individual residential owners.

Thus, all fifteen lots conveyed by Scot-Alan to Treasure Homes, at varying times, were subsequently conveyed by Treasure Homes to individual residential owners at varying times. Of the fifteen deeds conveyed from Treasure Homes to individual owners, ten contained restrictive covenants prohibiting construction of any structure except for a one-family house and a structure or outbuilding usually incident to a one-family house, and prohibiting ownership and housing of any animals except for "normal domestic pets."[5] One deed specifically allows horses to be kept on the property.[6]

---

[5] The restrictive covenants in the ten deeds are substantially uniform. They state: "1. Said premises shall be used solely for private residential purposes and no building or structure may be constructed, maintained or permitted to exist on said premises other than a private residential structure designed for and to be occupied by one family, and out-buildings or structures usually incident to private residences. 2. No animals or pets may be kept on said premises except normal domestic pets such as cats or dogs, and no animal may be kept for breeding purposes. 3. No poles, clotheslines or other devices or contrivances for the hanging or drying of laundry shall be placed, erected or maintained on or about said premises except a rotary clothes dryer contrivance which shall be enclosed by hedges, fences, or other materials at least six feet high. This restriction shall not relate or be deemed to relate to the interior of the buildings erected on said premises."

The deeds also state: "The restrictions as recited above are intended to cover the lot herein being conveyed and it is not the Grantor's intent that they shall bind any other property of the Grantor forming a part of the map described [in this deed] unless specifically referred to in future deeds of conveyance of said property by the Grantor."

[6] The subdivision is located in an area of Fairfield where zoning restrictions do not prohibit the keeping of horses or the erection of structures to house the animals.

The lot that specifically allows horses is across the street from the defendants' lot.[7] Two deeds contain restrictions of some kind that are crossed out, and two deeds contain no restrictions of any kind. In summary, four of the fifteen lots previously owned by Treasure Homes do not contain any restrictions in their chain of title, and one of the fifteen specifically allows what ten of the other lots prohibit. The defendants are successors in title to one of the ten lots containing all three restrictions. The defendants' deed contains a specific reference to the recorded deed of a predecessor in title whose prior deed contains the restrictions and the exception.[8] That exception, as noted by the plaintiffs in their brief, states the intent of the grantor, Treasure Homes, that the restrictions might not be imposed in the future on some of the lots owned by Treasure Homes.

The defendants purchased two horses and kept them on the property prior to the onset of the winter months, and expressed an intent to erect a stable for them.[9] The plaintiffs then filed their complaint, alleging violation of the restrictive covenants. The court concluded that the defendants' use of the premises constituted a violation of the restrictive covenants and that the plaintiffs could enforce the restrictive covenants because it was " 'more likely than not' " that there was an intention by the common grantor to establish a uniform plan of development for all of the lots on the Scot-Alan map.[10]

[7] There is a nature preserve near the subdivision with trails used for horseback riding on a daily basis.

[8] The exception language is in the last sentence quoted in footnote 5.

[9] Although the defendants removed the horses when the weather was cold, the appeal is not moot because the defendants intend to bring them back and to build a stable, if allowed.

[10] The court did not mention the exact identity of the common grantor. It can be inferred, however, that the common grantor referred to by the court was Scot-Alan, as the court mentioned foreclosed lots in its analysis. Treasure Homes did not lose any lots to foreclosure, making Scot-Alan the probable common grantor mentioned in the court's analysis.

The defendants claim that the court incorrectly determined that the restrictive covenants in their deed were enforceable. The validity of that assertion rests on the intent of the common grantor of the lots, as expressed in the language of the relevant deeds, considered in light of the surrounding circumstances. The plaintiffs and the defendants state that our standard of review of that determination of intent is the clearly erroneous standard because the intent of the common grantor is a question of fact.[11] Our case law, however, establishes that intent in this case is a question of law.

"Although in most contexts the issue of intent is a factual question on which our scope of review is limited . . . the determination of the intent behind language in a deed, considered in the light of all the surrounding circumstances, presents a question of law on which our scope of review is plenary. . . . Thus, when faced with a question regarding the construction of language in deeds, the reviewing court does not give the customary deference to the trial court's factual inferences." (Citations omitted; internal quotation marks omitted.) *Contegni* v. *Payne*, 18 Conn. App. 47, 51, 557 A.2d 122, cert. denied, 211 Conn. 806, 559 A.2d 1140 (1989). Intent is determined by the language of the particular conveyance in light of all the circumstances and is a question of law. *Kelly* v. *Ivler*, 187 Conn. 31, 39, 450 A.2d 817 (1982); *DeMorais* v. *Wisniowski*, 81 Conn. App. 595, 608–609, 841 A.2d 226, cert. denied, 268 Conn. 923, 848 A.2d 472 (2004).

Here, we must conduct a plenary review to determine intent by measuring the effect of the language contained in the relevant deeds, considered in light of the surrounding circumstances. A subsidiary question to be

[11] We are not bound by the parties' agreement. See *State* v. *Harris*, 60 Conn. App. 436, 443, 759 A.2d 1040, cert. denied, 255 Conn. 907, 762 A.2d 911 (2000).

resolved first is whether it is Scot-Alan's intent or the intent of Treasure Homes, as a common grantor, that is relevant.

To state the question on the basis of the facts of this case is to answer it. The common grantor is that owner of property who has divided it into building lots that are subject to a general development scheme as simultaneously expressed on the land records of the location of the property. See *Armstrong* v. *Leverone*, 105 Conn. 464, 470–71, 136 A. 71 (1927). Scot-Alan did not establish in any deed, by way of restrictive language, that it had a plan of general development for its property, nor did it establish the intent to make the lots on the map recorded by it subject to any restrictive covenants, nor did it record a declaration of restrictive covenants. Not having expressed any intent at all in connection with the fifteen lots it conveyed to Treasure Homes, Scot-Alan cannot be a common grantor with a general development scheme.

Treasure Homes is the grantor that is common to the successors in title who presently own the fifteen lots, and it is the intent of Treasure Homes, as evidenced in its conveyances of these lots at varying dates, to which we must look to determine if an enforceable plan for development existed. Treasure Homes did not subdivide the lots, did not record a declaration of restrictive covenants and never owned all of the lots at once. The question is whether other circumstances show a general development scheme of a common grantor.[12]

Restrictive covenants generally fall into one of three categories: "(1) mutual covenants in deeds exchanged

---

[12] The plaintiffs seem to argue that Scot-Alan and Treasure Homes should be treated as one entity to equal one common grantor: one part of the entity owning all of the land simultaneously and dividing it into lots (Scot-Alan), and another part of the entity subjecting the lots to a general development scheme (Treasure Homes).

by adjoining landowners; (2) uniform covenants contained in deeds executed by the owner of property who is dividing his property into building lots under a general development scheme; and (3) covenants exacted by a grantor from his grantee 'presumptively or actually for the benefit and protection of his adjoining land which he retains.' " *Grady* v. *Schmitz*, 16 Conn. App. 292, 296, 547 A.2d 563, cert. denied, 209 Conn. 822, 551 A.2d 755 (1988). This case allegedly falls into the second category of restrictive covenants, and we must determine whether Treasure Homes, as evidenced by the language contained in its conveyances, and all of the surrounding circumstances, intended to provide a uniform plan for the development of its fifteen lots.

Restrictive covenants should be enforced when they are reflective of a common plan of development. See *Marion Road Assn.* v. *Harlow*, 1 Conn. App. 329, 333, 472 A.2d 785 (1984). The factors that help to establish the existence of an intent by a grantor to develop a common plan are: (1) a common grantor sells or expresses an intent to put an entire tract on the market subject to the plan; (2) a map of the entire tract exists at the time of the sale of one of the parcels; (3) actual development according to the plan has occurred; and (4) substantial uniformity exists in the restrictions imposed in the deeds executed by the grantor. *Contegni* v. *Payne*, supra, 18 Conn. App. 53; 9 R. Powell, Real Property (1999) § 60.03 [6], p. 60-29.

The factors that help to negate the presence of a development scheme are: (1) the grantor retains unrestricted adjoining land; (2) there is no plot of the entire tract with notice on it of the restrictions; and (3) the common grantor did not impose similar restrictions on other lots. 9 R. Powell, supra, § 60.03 [7], p. 60-31.

Early Connecticut case law acknowledges the power of property holders with substantially uniform restric-

tive covenants obtained by deeds in a chain of title from a common grantor to enforce the restrictions against other owners with similar restrictive covenants. "When, under a general development scheme, the owner of property divides it into building lots to be sold by deeds containing substantially uniform restrictions, any grantee may enforce the restrictions against any other grantee." *Hooker* v. *Alexander*, 129 Conn. 433, 436, 29 A.2d 308 (1942); see also *Whitton* v. *Clark*, 112 Conn. 28, 36, 151 A. 305 (1930); *Stamford* v. *Vuono*, 108 Conn. 359, 364, 143 A. 245 (1928).

When making a finding as a matter of law that a common development scheme exists, courts look to four factors: (1) the common grantor's intent to sell all of the subdivided plots; (2) the existence of a map of the subdivision; (3) actual development of the subdivision in accordance with the general scheme; and (4) substantially uniform restrictions contained in the deeds of the subdivided plots. *Contegni* v. *Payne*, supra, 18 Conn. App. 53.

In discussing those factors, we observe that Treasure Homes did not possess title to all of the lots at any one time and possessed title to fifteen of the lots, as depicted on Scot-Alan's map, at varying times. We cannot know, therefore, if Treasure Homes had an intent to sell all of the subdivided plots it eventually owned. It did not own them all when it made its first conveyance subject to a restriction, nor had any document yet been recorded to indicate such an intent. Thus, the first factor is not present. Although there was a map that included fifteen lots eventually owned by Treasure Homes, the map contained no indication that the lots were or would be subject to any restrictions, and the map was filed by another entity, Scot-Alan.

A number of facts are relevant to determine whether the subdivision actually was developed in accordance

with a general scheme and whether substantially uniform restrictions were contained in the deeds of the fifteen lots conveyed by Treasure Homes.

The restrictions were placed on ten properties not adjacent to one another and were placed on those properties at different times. Treasure Homes obtained title to each lot individually and sold ten of those lots subject to restrictions in the deeds. Treasure Homes owned no more than four lots at any one time and owned only one lot at the time it conveyed that lot to the defendants' predecessors in title. Treasure Homes never owned all of the lots at one time, a fact that negates an intent to create a common plan for development.

Further, the sentence in most of the deeds of the ten lots with restrictions states in relevant part that the restrictions applied only to the lot being conveyed, "and it is not the Grantor's intent that they shall bind any other property of the Grantor . . . unless specifically referred to in future deeds of conveyances of said property . . . ." The plaintiffs in their brief state that this language means that the "grantor only intended to impose the restrictions on the lots where the restrictions were expressly stated in subsequent deeds of lots in the subdivision." The words in the deed, therefore, do not indicate an intent to impose uniform restrictions on all of the lots presently or in the future owned by Treasure Homes and negate an intent to create a general plan. See 20 Am. Jur. 2d, Covenants § 162 (1995). In addition, Treasure Homes conveyed two lots without any restrictions whatsoever; the deeds to two lots contain cross-outs of any restrictions. The lot directly across the street from the defendants has a provision in its chain of title that specifically allows horses to be housed there. This court cannot discern from the language of the deeds executed by Treasure Homes and the surrounding circumstances an intent to establish a common development scheme.

We are aware that "[t]he doctrine of the enforceability of uniform restrictive covenants is of equitable origin. The equity springs from the presumption that each purchaser has paid a premium for the property in reliance upon the uniform development plan being carried out. While that purchaser is bound by and observes the covenant, it would be inequitable to allow any other landowner, who is also subject to the same restriction, to violate it." *Contegni* v. *Payne,* supra, 18 Conn. App. 52; see also *Whitton* v. *Clark,* supra, 112 Conn. 35. The difficulty here, however, is that there is no uniform plan on which other purchasers could rely.

Although there is an origin in equity as to the rule allowing owners of land from a common grantor to enforce restrictions against other landowners that are substantially uniform in each owners' deeds, the Supreme Court has noted that the ultimate determination as to enforcement must rest on the determination of a question of law, namely, the intent of the grantor. *Whitton* v. *Clark,* supra, 112 Conn. 36. The earliest purchasers in a subdivision do not have other deeds on which to rely; they have only the intent of the grantor to impose those restrictions in other deeds in the future, as expressed in a subdivision map or in a recorded plan of development detailing the restrictive covenants to which the lots in a subdivision must comply. Id. Here, the first purchasers of lots from Treasure Homes only had a tenuous reliance on the intent of the grantor to impose future restrictions on lots to which the grantor did not yet possess title.[13]

*Hooker* and other cases contemplate an owner of real property who subdivides that property for subsequent

---

[13] For example, at the time the predecessors in title to the defendants took title from Treasure Homes, Treasure Homes did not own any other lot in the tract as shown on the map recorded by Scot-Alan. At the time that the predecessor in title to the plaintiffs Frank DaSilva and Rosalie M. DaSilva took title to lot thirty, Treasure Homes owned only one other lot in the tract.

sale in accordance with a general development scheme. That is not what happened here. One owner subdivided its land without any indication of common restrictions as to its use. Another owner acquired some of the lots and failed to establish a common plan for development.

Here, the deeded restriction applies to two thirds of the lots involved, but not to the other third, and falls short of evidencing a common plan. See id., 37 (twenty of fifty-four lots with restrictions does not show common plan). Enforceable restrictive covenants usually involve the presence of the same or similar restrictions in all or substantially all of the deeds conveyed by the common grantor. See *Hooker* v. *Alexander*, supra, 129 Conn. 436; *Armstrong* v. *Leverone*, supra, 105 Conn. 471. After balancing the factors involved in determining the presence or absence of the intent to create a common plan of development, we conclude that there was no intent to create such a common plan by Treasure Homes. "Restrictive covenants, being in derogation of the common-law right to use land for all lawful purposes which go with title and possession, are not to be extended by implication." *Pulver* v. *Mascolo*, 155 Conn. 644, 649, 237 A.2d 97 (1967); *Hooker* v. *Alexander*, supra, 436.

We conclude, as a matter of law, that the restrictions prohibiting the defendants from keeping horses and building a structure to house them are unenforceable.

The judgment is reversed and the case is remanded with direction to render judgment in favor of the defendants.

In this opinion the other judges concurred.