******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

BEACH, J., concurring in part and dissenting in part. I agree with the facts reported in the majority opinion and with most of the principles of law stated therein. I also agree with the analysis so far as it goes. The majority's analysis stops, however, with the conveyance from the original grantors, Horace Havemeyer and Harry Waldron Havemeyer, to Empire Estates, Inc. (Empire), reported in volume 792, page 118, of the Stamford land records.[1] The majority correctly concludes, in my view, that the plaintiffs have no standing to enforce restrictive covenants in the capacity of successor to any party to the transaction between the original grantors and Empire; the covenant between the original grantors and Empire restricting the conveyed property to residential use was "exacted by a grantor from his grantee presumptively or actually for the benefit and protection of his adjoining land which he [retained]." (Internal quotation marks omitted.) *Contegni* v. *Payne*, 18 Conn. App. 47, 51, 557 A.2d 122, cert. denied, 211 Conn. 806, 559 A.2d 1140 (1989).

Empire, however, later subdivided its property. Empire caused a map of the subdivision to be recorded and every newly created lot was subject to identical, or substantially identical, restrictions. The restrictions in the deeds provided that the lots were "conveyed subject to . . . restrictive covenants and agreements as contained in a deed from . . . [the original grantors] . . . to Empire Estates . . . and recorded in the land records . . . and the terms of a declaration [at volume 917, page 114]." The former set of restrictions are those referenced in the original grantors' deed, and recorded in volume 792, page 118 of the land records. They include the recitation that the "deed is given and accepted upon the following express covenants and agreements which shall run with the land herein conveyed and shall be binding upon the grantee, its successors and assigns, and shall enure to the benefit of the remaining land of the grantors. . . . 1. Said premises shall be used for private residential purposes only . . . and no buildings shall be erected or maintained upon said premises except single-family dwelling houses and appropriate outbuildings. 2. Said tract shall not be subdivided for building purposes into plots containing less than one (1) acre in area, and not more than one (1) such dwelling house shall be erected or maintained on any such plot."

The second set of restrictions referenced in the deeds to the lots comprising the subdivision are recited in a declaration recorded at volume 917, pages 114–18, of the land records. The parties agree that the second set of restrictions, imposed by Empire's trustees, were imposed pursuant to a common scheme of development

and, thus, are enforceable by subsequent owners of lots within the subdivision. See *DaSilva* v. *Barone*, 83 Conn. App. 365, 371–73, 849 A.2d 902, cert. denied, 271 Conn. 908, 859 A.2d 560 (2004); *Contegni* v. *Payne*, supra, 18 Conn. App. 52–54.

The language in the deeds by which Empire conveyed the lots in the subdivision stated that the lots were all "subject to" two sets of restrictions. A dispositive issue presented is whether the language in the deeds stating that the conveyed lots were "subject to" the original grantors' restriction had the effect only of providing notice of the prior restrictions to grantees or whether the language also had the substantive effect of creating new obligations on the grantees and their successors. Or, stated differently, the issue may be phrased as whether Empire had the intent to impose the common restrictions referenced in the original grantors' deed.

"The owner's intent to develop the property under a common scheme is evidenced by the language in the deeds. . . . [T]he determination of the intent behind language in a deed, considered in the light of all the surrounding circumstances, presents a question of law on which our scope of review is plenary." (Citation omitted; internal quotation marks omitted.) *Cappo* v. *Suda*, 126 Conn. App. 1, 8, 10 A.3d 560 (2011).

A useful discussion appears in 1 Restatement (Third), Property, § 2.2, comment (d), pp. 63–64 (2000): "The term 'subject to' can be used either to create a servitude or to disclose the fact that land conveyed is already burdened by a servitude. Since the term is ambiguous, courts must look to the surrounding circumstances to determine whether the parties used it with intent to create a servitude. . . . If the land conveyed was already burdened by such a servitude, the 'subject to' language is often included to qualify the grantor's covenant against encumbrances, rather than to create a new servitude. However, the circumstances that the property was already burdened by a servitude of the type described is not determinative. Other circumstances, *such as the fact that the language is used in conveyances that effectuate a new subdivision of land*, may justify the inference that the parties intended to create new servitudes for the *benefit of the other lot owners in the subdivision*." (Emphasis added.)

Comment d, illustration 3, to § 2.2 of the Restatement provides further insight: "Developer acquired a 40-acre parcel 'subject to' a restriction to residential uses only. The parcel had been burdened with such a servitude restriction 10 years earlier. In the absence of circumstances indicating a different intent, the conclusion is justified that the conveyance to Developer was not intended to create a new servitude. Developer then subdivides the parcel into 40 lots, according to a recorded plot map, and conveys each lot 'subject to' a restriction to residential uses only. The circumstances

justify the conclusion that the conveyances of the subdivided lots are intended to create new servitudes benefiting the other lot owners in the subdivision." Id., illustration (3), p. 64.

The conclusion that Empire intended to create a common scheme of development, maintaining the restriction that only residential uses were allowed, is justified. First, as noted in the Restatement, the recitation of the "subject to" restriction in the context of the creation of a subdivision itself supports the conclusion that the restriction is part of the common scheme of development. Second, the second set of restrictions in the deeds, newly created by Empire, reinforces the conclusion. This second set contains thirty-five articles, most of which dictate requirements governing the construction and maintenance of "houses" and "house sites." Other articles refer to pets allowed in "the family dwelling," the length of "any dwelling," and surveys for "proposed dwellings." The scheme clearly contemplates residences; there are no articles regarding commercial use or regulation of businesses.

Additionally, equity favors the standing of lot owners to enforce the restrictive covenants. It is not disputed that the restrictions substantially were uniform as to the lots in the subdivision, and each lot was conveyed subject to the original grantors' restriction.[2] Where there is a uniform scheme of development, "any grantee may enforce the restrictions against any other grantee." (Internal quotation marks omitted.) *DaSilva* v. *Barone*, supra, 83 Conn. App. 373. "The doctrine of the enforceability of uniform restrictive covenants is of equitable origin. The equity springs from the presumption that each purchaser has paid a premium for the property in reliance upon the uniform development plan being carried out. While that purchaser is bound by and observes that covenant, it would be inequitable to allow any other landowner, who is also subject to the same restriction, to violate it." *Contegni* v. *Payne*, supra, 18 Conn. App. 52. Regardless of the genesis of the first restrictive covenant, all of the owners in the subdivision were obligated to abide by it, and equity favors their ability to enforce it.

Several cases in Connecticut jurisprudence are consistent with the conclusion that the restriction as to residential use only is enforceable by a lot owner within the subdivision. See *Maganini* v. *Hodgson*, 138 Conn. 188, 192–93, 82 A.2d 801 (1951) (land deeded to developer restricted to residential use; developer imposed further restrictions on deeds to lots within subdivision: "[w]hen, under a general development scheme, the owner of property divides it into building lots to be sold by deeds containing substantially uniform restrictions, any grantee may enforce the restrictions against any other grantee"); *Mellitz* v. *Sunfield Co.*, 103 Conn. 177, 182, 129 A. 228 (1925) (restrictions for common benefit

of all subsequent lot owners "create a right or interest in them in the nature of an easement which will be enforced in equity against the grantee of one of the other lots"); *5011 Community Organization* v. *Harris*, 16 Conn. App. 537, 540, 548 A.2d 9 (1988) (restrictions in common scheme of development benefit lot owners); see also *Prime Locations of CT, LLC* v. *Rocky Hill Development, LLC*, 167 Conn. App. 786, 796 n.10, 145 A.3d 317, cert. denied, 323 Conn. 935, 150 A.3d 686 (2016).[3]

I would conclude, then, that the plaintiffs had standing to enforce the restriction regarding residential use, and I agree with the findings and conclusions of the trial court as to enforcement of the restriction, except as limited by the majority opinion in part II of its opinion. I, therefore, concur, in part, and respectfully dissent, in part.

[1] The restriction was amended in volume 808, page 355. The amendment is immaterial to the analysis of the issues in the present case.

[2] The majority suggests that even though the restrictions emanating from the original grantors "might apply with equal force to the parties and others in their subdivision, it cannot reasonably be suggested that the plaintiffs have the right to enforce them." In my view, the majority overlooks the clear language in *DaSilva* v. *Barone*, supra, 83 Conn. App. 372, and *Contegni* v. *Payne*, supra, 18 Conn. App. 51: where there are "uniform covenants contained in deeds executed by the owner of property who is dividing his property into building lots under a general development scheme," covenants may be enforced by those mutually bound. All of the factors listed in *DaSilva* and *Contegni* suggesting the existence of a common scheme are satisfied, and none of the negative factors exist. The majority and I disagree as to whether the original grantors' covenants are contained in deeds exected by Empire and whether equity favors the ability of those bound by common covenants to enforce those covenants.

[3] The majority goes to great lengths to distinguish the cases cited. I agree that the cases are not binding precedent but, rather, are only illustrative.